# EXHIBIT A

Angela Chasteen
Will County Circuit Clerk
Twelfth Judicial Circuit Court
Electronically Filed
2020L 000826
Filed Date: 8/19/2022 9:08 AM
Envelope: 19152950
Clerk: SE

**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT**
**WILL COUNTY, ILLINOIS**

| | | |
|---|---|---|
| DANTE SIMPSON, on behalf of himself and all other persons similarly situated, known and unknown, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 2020-L-000826 |
| v. | ) ) | Honorable Judge Roger D. Rickmon |
| OUR LADY OF ANGELS RETIREMENT HOME, and SMARTLINX SOLUTIONS, LLC | ) ) ) ) | |
| Defendants. | ) ) | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Dante Simpson ("Plaintiff"), on behalf of himself and all other persons similarly situated, known and unknown, files this First Amended Class Action Complaint ("Complaint") against Our Lady of Angels Retirement Home ("OLA") and SmartLinx Solutions, LLC ("Smartlinx") (collectively, "Defendants"), for violations of the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.*, and states:

**INTRODUCTION**

1.     Defendant, OLA, is a retirement home located in Joliet, Illinois in Will County, Illinois.

2.     Defendant, OLA's website advertises that it is a "premier independent, assisted and skilled nursing community, providing value-based services to all residents, enhancing their quality of life."

3.     Defendant, SmartLinx, provides workforce management and scheduling solutions in the long-term care and nursing marketplace. See Exhibit A.[1]

4.     Defendant SmartLinx provides biometric timekeeping solutions that integrate with

---

[1] Exhibit A is a PDF printout from Defendant SmartLinx's website, setting forth a company overview and the services SmartLinx provides.

**EXHIBIT A**

their workforce management and scheduling solutions services to long-term care and nursing care facilities throughout the State of Illinois, including but not limited to OLA. See Exhibit B; Exhibit C.[2]

5.       In addition to OLA, SmartLinx advertises on their website that they provide(d) their equipment and services to long-term care and nursing care facilities throughout the State of Illinois, including but not limited to:

  i.    Brookstone of Aledo;

  ii.   The Villas at St. James;

  iii.  Villas of Holly Brook Herrin;

  iv.   Villas of Holly Brook Chatham;

  v.    Villas of Holly Brook Effingham;

  vi.   Villas of Holly Brook Marshall;

  vii.  Villas of Holly Brook Newton; and

  viii. Villas of Holly Brook Shelbyville; and

  ix.   Greek American Rehabilitation & Care Centre.

See Ex. A; Ex. B; Ex. C.[3]

6.       Plaintiff was employed by Defendant OLA as a housekeeper from approximately December 2018 through sometime in 2020.

7.       Among the products and services provided by SmartLinx to long-term care and nursing facilities throughout Illinois, which includes but is not limited to OLA and the facilities listed in ¶ 5, are various pieces of technology hardware necessary for utilizing SmartLinx's "innovative scheduling products and software – Time and Attendance (TA) and Schedule Optimizer (SO), with

---

[2] Exhibit B is Defendant OLA's Motion for Leave to File a Third-Party Complaint Against SmartLinx. See, specifically, ¶¶ 7 – 11 of the proposed Third-Party Complaint.
[3] Exhibit C is a PDF printout from SmartLinx's website. See, specifically, page 15/19 of the PDF printout, setting forth the long-term care and nursing care organizations and/or corporations serviced by SmartLinx. The organizations set forth in ¶¶ 5(i) – 5(viii) operate under the umbrella of Meridian Senior Living.

the latest scheduling version including a feature called 'Ideal Schedule,'" are biometric timeclocks. See Ex. D.[4] The timeclock requires employees, like Plaintiff, to disclose their biometric identifiers by scanning their fingerprints into the device.

8.     Beginning at the time of his hire, OLA required Plaintiff and other employees to use a biometric time clock system to record their time worked.

9.     Upon information and belief, the same biometric timeclocks were utilized in the same manner in facilities throughout Illinois, including but not limited to those listed in ¶¶ 5(i) – 5(viii) herein.

10.    Unlike an employee identification number or employee identification card, fingerprints are *unique* and *permanent* identifiers.

11.    By requiring employees to scan their fingerprints to record their time, instead of identification numbers or badges only, OLA ensured that one employee could not clock in for another.

12.    Likewise, by collecting and/or capturing biometric identifiers, to wit, their fingerprints, SmartLinx utilized that data to implement its TA, SO, and other workforce management software features.

13.    Thus, OLA received labor management benefits from using a biometric timeclock.

14.    Both Defendants achieved financial benefits from using a biometric time clock.

15.    Likewise, both Defendants placed employees at risk based on their use of employees' biometric identifiers after they had been made to use the biometric timeclock(s) in question without complying with the statutes addressed herein.

16.    As is set forth in greater detail below, both Defendants violated BIPA, in several respects, by: (1) improperly capturing and/or collecting the biometric identifiers of the Plaintiff and

---

[4] Exhibit D is a Verified Complaint filed in *SmartLinx Solutions, LLC, v. Viteslav Zeif*, 2:21-cv-711-BHH (D. S.C. 2021), pg. 3, ¶ 11.

the Class and Subclass that he seeks to represent; (2) failing to provide adequate written notice, informing the Plaintiff and the Class and Subclass that he seeks to represent of the same; (3) failing to obtain written releases from the Plaintiff and the Class and Subclass that he seeks to represent; and (4) improperly disclosing and/or disseminating the biometric identifiers of the Plaintiff and the Class and Subclass that he seeks to represent. 740 Ill. Comp. Stat. Ann. 14/15.

## THE PARTIES

17.    Plaintiff is an individual and a citizen of Illinois.

18.    Defendant, OLA, is a domestic not-for-profit corporation, located in Joliet, Illinois.

19.    OLA's principal office is in Joliet, Illinois.

20.    Defendant, SmartLinx, is a foreign LLC, registered to do business in Illinois.

21.    SmartLinx's principal office is in Iselin, New Jersey.

## SUMMARY OF CLAIMS

22.    At the commencement of Plaintiff's hire, OLA required him and other employees to utilize the biometric time clock system device provided to them by SmartLinx, which interfaced with certain SmartLinx software licensed by OLA, in order to (a) verify the identity of a particular employee; and (b) maintain a system of record of various information including but not limited to the employees' hours worked and a host of other beneficial use cases, as discussed in greater detail below.

23.    SmartLinx's timeclock devices work in tandem with its software by extracting biometric information from individuals, such as fingerprints, or portions thereof, and subsequently using the same for authentication, regulatory reporting and compliance, timekeeping, preventing time-theft, to produce workforce analytics, scheduling, staffing, and for payroll purposes.

24.    SmartLinx's biometric timekeeping and workforce management system includes the dissemination of biometrics to third parties, including but not limited to data storage vendors, other long term care facilities, staffing agencies and other ancillary service providers.

25.     The agreement to provide OLA the biometric time clock devices and the other SmartLinx software and support services (the "Agreement") was executed between the Defendants OLA and SmartLinx on December 22, 2017. See Ex. B.[5]

26.     The Agreement defines "Customer Data" as "all electronic data or information submitted by Customer or its Authorized Users to and stored by the Subscription Service."[6]

27.     The Agreement included SmartLinx's Statement of Work ("SOW"), for the provision of "Subscription Services" including the biometric timeclock to be used by OLA. Id.[7] Furthermore, the SAAS Terms and Conditions Agreement, provided, in relevant part:

> This Agreement sets forth the terms under which SmartLinx will provide Customer with access to and use of certain software-as-a-service offering(s) identified in the applicable Order Schedule (each a "**Subscription Service**" and collectively, the "**Subscription Services**") and related Equipment. Any updates or enhancements to a Subscription Service provided as part of Maintenance for same will be deemed to be part of such Subscription Service. The Subscription Services are hosted by SmartLinx and accessed and used by Authorized Users via the Internet.

Id[8].

28.     Plaintiff, and all others similarly situated, were required to scan their fingerprints in Defendants' biometric time clock device, at the very least, each and every time they started or commenced work in the facility.

29.     Unlike an employee identification number or employee identification card, fingerprints are *unique* and *permanent* identifiers.

30.     By requiring employees to scan their fingerprints to record their time, instead of

---

[5] See OLA's Motion, specifically, the proposed Third-Party Complaint, pg. 5 – 6, ¶¶ 7 – 11.
[6] Exhibit G is a copy of the full SAAS Terms and Conditions Agreement, pg. 1, § 1 ("Definitions").
[7] See OLA's Motion, specifically, the proposed Third-Party Complaint, pg. 5 – 6, ¶ 7.
[8] See Exhibit B, OLA's Motion (Exhibit A to the Motion for Leave to File), pages 25-26 of OLA's Motion and accompanying exhibit(s), specifically, the "SAAS Terms and Conditions Agreement" between SmartLinx and OLA.

identification numbers or badges only, this ensured that one employee could not clock in for another.

31.    Thus, in addition to multiple other labor management benefits, OLA achieved a labor management benefit from using a biometric time clock mechanism.

32.    SmartLinx's system ensures that Plaintiff, and all others similarly situated, could only verify their attendance and timeliness using its biometric timekeeping device.

33.    SmartLinx's own website advertises:

EASY ENFORCEMENT

Manage costs by enforcing pay policies

Prevent time theft, buddy punching, and excessive overtime. Only allow punches at the right time and location, thanks to our flexible rule engine. And ensure accountability with touchless or fingerprint-enabled time clocks, built in the U.S.

See Ex. E.[9]

34.    Indeed, SmartLinx further advertises its biometric timeclocks' "unprecedented accuracy," asserting:

UNPRECEDENTED ACCURACY
Protect your budget - and data

Stop losing money on time theft and wasting resources on correcting missed punches. Our state-of-art time clocks feature a range of capabilities that promote accountability ranging from *biometric-enabled fingerprint scanners* and proximity badges to touchless time clocks with unique QR codes. Automated backups and secure storage in the cloud and protect your data in case of network outages or unexpected events (emphasis added).[10]

35.    SmartLinx, through its clients' use of the biometric timeclocks discussed herein, collected and possessed the biometric identifiers, to wit, the fingerprints of the Plaintiff and the Class and Subclass he seeks to represent.

36.    Specifically, as set forth in paragraph 3.3 of the "Statement of Work" ("SOW")

---

[9] Exhibit E is a screenshot of SmartLinx's website, combined with a PDF printout of the same; < https://www.smartlinx.com/products/time-and-attendance/>, accessed on July 13, 2022.
[10] The representations made on SmartLinx's website set forth in paragraph 31 link to another page on the website, <https://www.smartlinx.com/products/time-clocks/>, in which the representations contained in paragraph 31 are set forth.

between OLA and SmartLinx, SmartLinx collected, captured, and/or otherwise possessed Plaintiff and the Class's biometric identifiers. See Ex. B.[11]

37.     Furthermore, upon information and belief, OLA and SmartLinx transmitted the underlying biometric identifiers to a host of other unknown third parties, as stated in the Agreement, which provides, in relevant part:

> **2.5 Third Party Services.** SmartLinx or third party providers may offer Third Party Services to Customer hereunder. Customer acknowledges and understands that the use of such Third Party Services shall be subject to separate terms and conditions as set forth on an Order Schedule or as otherwise provided to Customer. Except as expressly set forth in the Order Schedule, SmartLinx does not warrant any such Third Party Services. If Customer installs or enables Third Party Services for use in conjunction with the Subscription Service, Customer agrees that SmartLinx may allow such third party providers to access Customer Data as required for the interoperation of such Third Party Services with the Subscription Service, and any exchange of data or other interaction between Customer and a third party provider is solely between Customer and such third party provider. Finally, the continuing availability of the Third Party Services is subject to the continued effectiveness and terms of the contract between SmartLinx and the third party provider.

38.     The Agreement defines "Third Party Services," as, "applications or services that are provided by third parties, and interoperate with the Subscription Service." See Ex. B.[12]

39.     The Agreement provides, further:

> **2.7 Transmission of Data.** The Subscription Service allows Customer to send and receive Electronic Communications and Customer understands that the technical processing and transmission of Customer's Electronic Communications is fundamentally necessary to use of the Subscription Service. Customer acknowledges and understands that Customer's Electronic Communications will involve transmission over the Internet, and over various networks, only part of which may be owned and/or operated by SmartLinx. SmartLinx is not responsible for any Electronic Communications and/or Customer Data which are delayed, lost, altered, intercepted or stored during the transmission of any data across networks not owned and/or operated by SmartLinx, including but not limited to, the Internet and Customer's local network.

---

[11] Included as Exhibit A to OLA's Motion, which is set forth in its entirety as Exhibit B to the instant First Amended Complaint.
[12] See Exhibit B, OLA's Motion (Exhibit A to the Motion for Leave to File), pages 25-26 of OLA's Motion and accompanying exhibit(s), specifically, the "SAAS Terms and Conditions Agreement" between SmartLinx and OLA.

Id.[13] SmartLinx, in its own Agreement with OLA, both acknowledges its possession and transmission of customer data, to wit, biometric identifiers, and at the same time, attempts to abrogate responsibility should that data be leaked or otherwise improperly stored or intercepted. Id.

40.    In addition, through their acquisition and utilization of the biometric data acquired, Smartlinx achieved significant business and financial benefits, including but not limited to their ability to utilize the very same underlying illegally acquired biometric data in the use and licensing of, or the creation and licensing of, new software products and/or enhancements to OLA and other third parties.

41.    Furthermore, SmartLinx is or has utilized the underlying illegally acquired biometric data to develop software that utilizes Artificial Intelligence ("AI") technology to develop a "staffing tool that will serve as a digital matchmaker between available senior care staff and facilities near them. The digital marketplace they're creating in tandem with staffing companies will allow qualified individuals to move from one facility to another based on the needs of those facilities." See Ex. F.[14]

42.    SmartLinx has publicly acknowledged that they are using the data they have collected to automatically create cost benchmarks in particular ZIP codes. In a June 1, 2021, interview SmartLinx's Chief Technology Officer, Anil Chilarige, stated, as it relates to staffing in senior living facilities, "We've gathered information over the years — and now we're putting it to use. We're mapping the trends of cost, how it's changing over the years, and we can predict future costs in an area." Id.

---

[13] See Exhibit B, OLA's Motion (Exhibit A to the Motion for Leave to File), pages 25-26 of OLA's Motion and accompanying exhibit(s), specifically, the "SAAS Terms and Conditions Agreement" between SmartLinx and OLA.

[14] Exhibit F is a PDF printout of a June 1, 2021 article discussing SmartLinx and its products. ROJ-NJ.com, <https://www.roi-nj.com/2021/06/01/tech/senior-care-solutions-iselin-based-company-is-using-ai-to-help-address-pain-points-in-elder-care-industry/?utm_content=168651571&utm_medium=social&utm_source=twitter&hss_channel=tw-4109867063>, accessed on July 28, 2022.

43.     Indeed, in their own civil action against a former employee, *SmartLinxSolutions, LLC, v. Viteslav Zeif*, 2:21-cv-711-BHH (D. S.C. 2021), filed in the US District Court for the District of South Carolina, SmartLinx alleged, in relevant part:

> The SmartLinx Ideal Schedule feature reviews the census level at a nursing facility and creates an ideal schedule to provide the most balanced and efficient staffing at the facility. **Specifically, the Ideal Schedule scans the SmartLinx comprehensive database for available nurses and recommends a list of internal and outside staff for the facility.** For example, the Ideal Schedule may recommend a more efficient and economical approach by scheduling staff from another facility rather than contacting a staffing agency. (emphasis added).

See Ex. D, at ¶18.

44.     Furthermore, SmartLinx's complaint goes on to allege, "During the past year, SmartLinx has worked with other staffing agencies to roll out a new program that integrates the scheduling needs of nursing facilities with the supply of nurse staffing agencies through one interface provided by SmartLinx." *Id.* at ¶19.

45.     SmartLinx's admissions in its Complaint, set forth herein in ¶ 44, acknowledge the collection and/or capture, possession, and dissemination of Plaintiff, the Class and Subclass's biometric identifiers or information, but also admitting to the sale, lease, trade or otherwise profiting from the integration of the biometric data to an unknown number of third-party staffing agencies and other nursing facilities.

46.     In enacting BIPA, the Illinois legislature recognized that biologically unique identifiers, like fingerprints, can never be changed when compromised, and thus subject a victim of identity theft to heightened risk of loss.

47.     As a result, Illinois restricted private entities, like Defendants, from collecting, storing, using, or transferring a person's biometric identifiers and information without adhering to strict informed consent procedures established by BIPA.

48.    Plaintiff used Defendants' biometric timeclock, thereby having his fingerprints collected, possessed, and, ultimately, disclosed by both Defendants, when he clocked in and out of work each day between December 2018 and into 2020.

49.    By OLA requiring Plaintiff to scan his biometric identifiers, to wit, his fingerprints, and SmartLinx's device scanning the same, Defendants both, respectively, captured and/or collected, and, subsequently, possessed Plaintiff's biometric identifiers.

50.    Defendants, both, respectively, collected and/or captured, stored, used, and transferred the unique biometric fingerprint identifiers, or information derived from those identifiers, of Plaintiff and others similarly situated without following the detailed requirements of BIPA.

51.    As a result, Defendants, both, respectively, violated BIPA and compromised the privacy and security of the biometric identifiers and information of Plaintiff and other similarly situated employees.

## JURISDICTION AND VENUE

52.    This Court has personal jurisdiction over OLA as, during the relevant time period, OLA did business in Illinois, was registered to do business in Illinois, and committed the statutory violations alleged in this Complaint in Illinois.

53.    This Court has personal jurisdiction over SmartLinx as, during the relevant time period, SmartLinx did business in Illinois, was registered to do business in Illinois as a foreign corporation pursuant to the Illinois Business Corporation Act of 1983, 805 ILCS 5/ §13.05, and committed the statutory violations alleged in this Complaint in Illinois.

54.    Will County is an appropriate venue for this litigation because both Defendants transact business in Will County.

## REQUIREMENTS OF THE BIOMETRIC INFORMATION PRIVACY ACT

55.    In enacting BIPA, the Illinois legislature recognized that the full ramifications of

biometric technology are not yet fully known and so the public will benefit from "regulations on the collection, use, safeguarding, handling, storage retention, and description of biometric identifiers and information." 740 ILCS 14/5(f)-(g).

56.    BIPA prohibits a "private entity" from capturing or collecting biometric identifiers or information from an individual unless that private entity first obtains the individual's written consent or employment-related release authorizing the private entity to capture or collect an individual's biometric identifiers and/or biometric information. 740 ILCS 14/15(b)(3).

57.    Relatedly, BIPA prohibits a private entity from capturing or collecting biometric identifiers or information from an individual unless that private entity first informs the individual, in writing, of the following: (a) that the private entity is collecting biometric identifiers or information, (b) purpose of such collection, and (c) the length of time the private entity will retain the biometric identifiers or information. 740 ILCS 14/15(b)(1)-(2).

**BACKGROUND FACTS (BIOMETRIC PRIVACY ACT ALLEGATIONS)**

58.    When Plaintiff scanned his fingerprint in Defendants' biometric time clock mechanism, Defendants' and potentially others, captured and stored Plaintiff's fingerprint, or personal identifying information derived from Plaintiff's fingerprint.

59.    When Plaintiff scanned his fingerprint into the biometric time clock mechanism, OLA disclosed his fingerprint – or personal identifying information derived from his fingerprint – to SmartLinx amongst potentially as of yet identified parties.

60.    The Agreement between the parties' states as follows:

**General Assumptions:**

3. The Subscription Services are hosted by SmartLinx and accessed and used by the Customer [OLA] as a hosted service via the Internet." See Ex. B.[15]

---

[15] See Exhibit B, OLA's Motion (Exhibit A to the Motion for Leave to File), pages 14 – 15/26 of the Motion and accompanying exhibit(s), specifically, the "SOW."

61.     Further included within the Agreement described herein, in ¶¶ 25 – 26 and 35 – 36, between SmartLinx and OLA were the following obligations to be completed by SmartLinx, relating to the biometric timeclocks and licensing/access of the software:

Time Clocks

*SmartLinx Activities*

1.     Configuration of the Time Clock based on the requirements established.

2.     Educating Customer [OLA] on best practices and methods for conducting enrollment activities. (Pages 12-13).

3.     SmartLinx will provide updated pay policy and network setting requirements for the deployed Time Clocks.

4.     SmartLinx will provide time clocks configured to the specification determined during requirements gathering.

. . . .

62.     The Agreement conveys, further:

Data exchange between SmartLinx and 3rd party systems will be performed by placing the file into a secure FTP location which can be accessed using Industry standard host key authentication.

*Id.*[16]

63.     The Agreement between SmartLinx and OLA provides further, in relevant part:

3. Equipment and Maintenance.

3.1 Equipment may be provided to Customer under a purchase transaction or an equipment lease transaction as specified in the applicable Order Schedule. In either case, SmartLinx shall deliver and customer shall accept delivery of the Equipment at the location set forth in the Order Schedule.

See Ex. G.[17]

64.     Upon information and belief, SmartLinx entered into substantially similar agreements with, by way of example only:

        i.     Brookstone of Aledo;

---

[16] See Exhibit B, OLA's Motion (Exhibit A to the Motion for Leave to File), pages 23/26 of the Motion and accompanying exhibit(s), specifically, the "SOW."

[17] Exhibit G is a copy of the full SAAS Terms and Conditions Agreement, pg. 3, § 3.1.

    ii.   The Villas at St. James;

    iii.  Villas of Holly Brook Herrin;

    iv.  Villas of Holly Brook Chatham;

    v.   Villas of Holly Brook Effingham;

    vi.  Villas of Holly Brook Marshall;

    vii.  Villas of Holly Brook Newton;

    viii. Villas of Holly Brook Shelbyville; and

    ix.  Greek American Rehabilitation & Care Centre.

65.    Upon information and belief, SmartLinx entered into substantially similar agreements with several long-term care and nursing care facilities, other than those listed in ¶¶ 5 and 64, across the State of Illinois, affecting thousands of Illinois employees, providing biometric timekeeping devices to each, and collecting, possessing, and disseminating these employees' biometric identifiers, to wit, their fingerprints.

66.    Before requiring Plaintiff, and the Class and Subclass of people he seeks to represent, to use a biometric time clock, neither Defendant ever provided Plaintiff any materials, including in writing, stating that it was collecting, retaining, or disclosing his fingerprint or personal identifying information derived from his fingerprint.

67.    Prior to requiring Plaintiff to use the biometric time clock mechanism, SmartLinx never obtained Plaintiff's written consent, nor did OLA obtain a written release as a condition of employment, authorizing the collection, storage, dissemination, or use of his fingerprint or personal identifying information derived from Plaintiff's fingerprint.

68.    Defendants violated Plaintiff's privacy by capturing or collecting his unique biometric identifiers and information and sharing those identifiers and information with various other parties without his consent.

69.    In addition, BIPA prohibits a private entity from possessing biometric identifiers or information unless it creates and follows a written policy, made available to the public, establishing a retention schedule and destruction guidelines for its possession of biometric identifiers and information. 740 ILCS 14/15(a).

70.    Prior to collecting and/or otherwise capturing Plaintiff's biometric identifiers through use of its biometric technology, Defendants failed to make publicly available any written policy as to a biometric identifier retention schedule, or guidelines for permanently destroying the collected biometric identifiers.

71.    Finally, BIPA prohibits private entities from disclosing or otherwise disseminating biometric identifiers or information without first obtaining an individual's consent for that disclosure or dissemination, unless the disclosure or dissemination was (a) in furtherance of an authorized financial transaction, (b) authorized by law, or (c) pursuant to a valid warrant or subpoena. 740 ILCS 14/15(d).

72.    Defendants both, failed to obtain consent from the Plaintiff, and Class and Subclass he seeks to represent, before disclosing or otherwise disseminating their biometric identifiers.

**BIOMETRIC INFORMATION PRIVACY ACT CLASS ACTION ALLEGATIONS**

73.    Plaintiff seeks to represent a putative class, the "Class" and a putative subclass of the class ("Subclass") pursuant to 735 ILCS 5/2-802(b).

74.    The Class consists of:

All employees in the State of Illinois who scanned their fingerprints or other biometric identifiers on or into the SmartLinx biometric timeclock mechanism, or whose biometric identifiers, as defined under 740 ILCS 14/10, were utilized in any manner in any software owned, developed, acquired, modified and/or, licensed by SmartLinx to third-parties or for Smartlinx's own internal use, between May 13, 2015 and the present, without first executing a written release.

75.    The alleged violations and attendant damages related to the violations of BIPA by SmartLinx in this class are separate and distinct violations from those alleged by Plaintiff against OLA

14

in Counts I, III, and V below.

76.     The class members are substantially similar to one another as they were all employed in long-term care and/or nursing care facilities throughout the State of Illinois, which utilized the SmartLinx biometric timeclock, and were subject to the same allegedly illegal practices: SmartLinx's failure to adhere to the requirements of BIPA.

77.     The Class includes more than 50 members.

78.     As a result, the Class is so numerous that joining of all class members in one lawsuit is not practical.

79.     The Subclass consists of:

All employees of OLA, who scanned their fingerprints or other biometric identifiers on or into the SmartLinx biometric timeclock mechanism, or whose biometric identifiers as defined under 740 ILCS 14/10 were utilized in any manner by OLA between October 8, 2015 and the present without first executing a written release.

80.     The Class's and the Subclass's claims all stem from the same or substantially similar conduct, as they were all subject to the same allegedly illegal practices of both OLA's and SmartLinx's failure to adhere to the requirements of BIPA.

81.     The Subclass includes more than 50 members.

82.     As a result, the Subclass is so numerous that joining of all Subclass members in one lawsuit is not practical.

83.     The issues involved in this lawsuit present common questions of law and fact, including whether OLA required both members of the Subclass who are subsumed into the Class to scan their fingerprints to clock in and out during shifts; whether Defendants collected the Class and Subclass's "biometric identifiers" or "biometric information" under BIPA; and whether Defendants complied with the procedures in 740 ILCS 14/15(a), (b), and (d) of BIPA.

84.     These common questions of law and fact predominate over variations that may exist between members of both the Class and Subclass, if any.

85.    Plaintiff, the members of the Class and Subclass, and Defendants alike have a commonality of interest in the subject matter of the lawsuit and the remedy sought.

86.    If individual actions were required to be brought by each member of either the Class or Subclass injured or affected, the result would be a multiplicity of actions, creating a hardship to the Class or Subclass, to the Court, and to Defendants.

87.    Accordingly, a class action with a sub-class pursuant to 735 ILCS 5/2-802(b) is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common funds to which the Classes are entitled.

88.    The books and records of both Defendants are material to Plaintiff's case as they disclose how and when Plaintiff and the Class/Subclass had their fingerprints scanned in Defendants' biometric time clock system and what information Defendants provided Plaintiff and the Classes about the collection, retention, use, and dissemination of their biometric identifiers and information.

89.    Plaintiff and his counsel will fairly and adequately protect the interests of the Classes.

90.    Plaintiff retained counsel experienced in complex class action litigation.

**DEFENDANTS' CONDUCT WAS INTENTIONAL OR RECKLESS**

91.    BIPA provides that any person aggrieved by a violation of this Act shall have a right of action in a State circuit court or as a supplemental claim in federal district court against an offending party. A prevailing party may recover for each violation: (1) against a private entity that negligently violates a provision of this Act, liquidated damages of $1,000 or actual damages, whichever is greater; or (2) against a private entity that intentionally or recklessly violates a provision of this Act, liquidated damages of $5,000 or actual damages, whichever is greater. 740 ILCS 14/20.

92.    Both respective Defendants' actions, in violating BIPA, demonstrated courses of action, which showed a knowing risk or conscious disregard that their conduct would harm the Plaintiff, the Class, and the Subclass, and/or an utter indifference to, or conscious disregard for the

biometric privacy rights of the Plaintiff and the class he seeks to represent, as well as the safety and security of their biometric identifiers.

93.     Despite the fact that BIPA had been in existence since 2008, and by extension, set the minimum notice, consent, and security requirements for collection of biometric identifiers in Illinois, OLA failed to independently investigate or take precautions to ensure its compliance with BIPA.

94.     OLA failed to take precautions other than accepting SmartLinx's assurances that "use of the biometric timeclock would not expose [OLA] to liability under [BIPA]." See Ex. B.[18]

95.     By its own admission, OLA was well aware of the existence of BIPA and the attendant compliance requirements. Yet, they simply relied on the vendor who they knew or should have known had significant pecuniary gain from their (mis)representations to provide them legal advice. *Id*.

96.     Indeed, the Agreement between OLA and SmartLinx provides even more evidence of OLA's reckless or intentional misconduct, as the Agreement includes an express representation that OLA would not rely on SmartLinx for legal advice:

> restrictions and data protection laws. Customer will be solely responsible: (i) for compliance by Customer with all laws and governmental regulations affecting Customer's business, (ii) for using the Subscription Services in a manner to assist it in complying with same, and (iii) the content and accuracy of all reports and documents prepared in whole or in part by using the Subscription Services. Customer will review any calculations made by using the Subscription Services and satisfy itself that those calculations are
>
> correct. The Subscription Services are not a substitute for the advice of an attorney and do not include any legal, regulatory, accounting or tax advice and Customer and its affiliates will rely solely upon their own advisors with respect to any such advice. Customer agrees and acknowledges that SmartLinx is not a law firm, does not provide legal advice or representation, and that no attorney-client relationship exists or will be formed between SmartLinx and Customer.

---

[18] See OLA's Motion, specifically, the proposed Third-Party Complaint, pg. 8 – 9, ¶¶ 27 – 31.

Ex. G.[19]

97.  Upon information and belief, OLA undertook no additional precautions to ensure its compliance with BIPA, did not establish a data retention, storage, or destruction policy related to biometric data, and left the sufficiency of its security measures for protecting Plaintiff and the Subclass's biometric identifiers to chance.

98.  OLA's failure to investigate its "concerns," or undertake additional investigatory and digital security precautions demonstrates an utter indifference to, or conscious disregard for the biometric privacy rights of the Plaintiff and the class he seeks to represent, as well as the safety and security of their biometric identifiers.

99.  Similarly, despite the fact that BIPA has been in existence since 2008, and by extension, set the minimum notice, consent, and security requirements for collection of biometric identifiers in Illinois, and despite the fact that by its own admission, SmartLinx provides hardware and software services to long-term care and nursing care facilities nationwide, including across the State of Illinois, SmartLinx failed to undertake proper precautions to ensure its biometric timeclock and related software services' were in compliance with BIPA. See Ex. A.

100.  Indeed, SmartLinx advertises itself as "The trusted name in the senior care industry," boasting that, "Thousands of facilities provide better care thanks to SmartLinx." *Id.*

101.  SmartLinx, in its Agreement with OLA and, upon information and belief, with long-term care and nursing care facilities throughout the State of Illinois, represented that it would comply with "all applicable laws and regulations affecting the operation of SmartLinx' business, including any applicable export restrictions and data protection laws." Id.[20] SmartLinx was well aware that there existed state and federal data privacy laws to which it must comply.

---

[19] Exhibit G is a copy of the full SAAS Terms and Conditions Agreement, pg. 2 – 3, 2.11.
[20] See SAAS Terms and Conditions Agreement, pg. 2 – 3, 2.11.

102.    Notwithstanding those representations, SmartLinx knew or should have known that its biometric timeclock and its practices for collecting and/or capturing, possessing, storing, destroying, profiting and disseminating Plaintiff and the Class's biometric identifiers were legally inadequate, and did not comply with BIPA. See Ex. B.[21]

103.    On at least one occasion, SmartLinx allegedly falsely represented to a client, OLA, that its biometric timeclock and its practices for collecting and/or capturing, possessing, storing, destroying, and disseminating Plaintiff and the Class's biometric identifiers were legally sufficient, and comply with BIPA. See Ex. B.[22]

104.    Accordingly, Defendants' violations of BIPA were reckless or intentional.

**COUNT I – AGAINST OLA**
**Violation of the Biometric Information Privacy Act (740 ILCS 14/15(b))**
**(Class Action)**

105.    Plaintiff realleges and incorporates the previous allegations of this First Amended Complaint.

106.    OLA is a "private entity" under BIPA. 740 ILCS 14/10.

107.    Plaintiff's and the Subclass's fingerprints qualify as "biometric identifier[s]" as defined by BIPA. 740 ILCS 14/10.

108.    OLA has "biometric information" from Plaintiff and the Subclass through its acquisition and retention of personal identifying information based on Plaintiff's and the Subclass's fingerprints.

109.    OLA violated BIPA by capturing or collecting Plaintiff's and the Subclass's fingerprints and personal identifying information based on their fingerprints without first informing them in writing that OLA was doing so.

---

[21] See OLA's Motion, specifically, the proposed Third-Party Complaint, pg. 8 – 9, ¶¶ 27 – 31.
[22] See OLA's Motion, specifically, the proposed Third-Party Complaint, pg. 8 – 9, ¶¶ 27 – 31.

110.    OLAs violated BIPA by capturing or collecting Plaintiff's and the Subclass's fingerprints and personal identifying information based on their fingerprints without first informing them in writing of the purpose of OLA doing so and the length of time OLA would store and use Plaintiff's and the Subclass's biometric identifiers and/or biometric information.

111.    OLA violated BIPA by capturing or collecting Plaintiff's and the Subclass's fingerprints and personal identifying information based on their fingerprints without first obtaining their written consent or other release authorizing OLA to capture or collect Plaintiff's and the Subclass's biometric identifiers and/or biometric information.

112.    Unlike other companies doing business in Illinois, OLA failed to take notice and follow the requirements of BIPA, even though the law was enacted in 2008, and numerous articles and court filings about the law's requirements were published before OLA committed the legal violations alleged in this First Amended Complaint.

113.    OLA's violation of BIPA was reckless or intentional or, in the alternative, negligent.

WHEREFORE, Plaintiff and the Subclass pray for a judgment against OLA as follows:

A.    Awarding liquidated or actual monetary damages, whichever is higher, to Plaintiff and Subclass for each violation of BIPA as provided by 740 ILCS 14/20(1)-(2);

B.    Enjoining OLA from committing further violations of BIPA as authorized by 740 ILCS 14/20(4);

C.    Awarding Plaintiff's reasonable attorneys' fees and costs incurred in filing and prosecuting this action as provided by 740 ILCS 14/20(3); and

D.    Such other and further relief as this Court deems appropriate and just as provided by 740 ILCS 14/20(4).

**COUNT II – AGAINST SMARTLINX**
**Violation of the Biometric Information Privacy Act (740 ILCS 14/15(b))**
**(Class Action)**

114.    Plaintiff realleges and incorporates the previous allegations of this Complaint.

115.    SmartLinx is a "private entity" under BIPA. 740 ILCS 14/10.

116.    Plaintiff's, the Class's, and the Subclass's fingerprints qualify as "biometric identifier[s]" as defined by BIPA. 740 ILCS 14/10.

117.    SmartLinx has "biometric information" from Plaintiff, the Class, and the Subclass through its acquisition and retention of personal identifying information based on Plaintiff's, the Class's, and the Subclass's fingerprints.

118.    SmartLinx violated BIPA by capturing or collecting Plaintiff's, the Class's, and the Subclass's fingerprints and personal identifying information based on their fingerprints without first informing them in writing that SmartLinx was doing so.

119.    SmartLinx violated BIPA by capturing or collecting Plaintiff's, the Class's, and the Subclass's fingerprints and personal identifying information based on their fingerprints without first informing them in writing of the purpose of Defendants doing so and the length of time SmartLinx would store and use Plaintiff's, the Class's, and the Subclass's biometric identifiers and/or biometric information.

120.    SmartLinx violated BIPA by capturing or collecting Plaintiff's, the Class's, and the Subclass's fingerprints and personal identifying information based on their fingerprints without first obtaining their written consent or other release authorizing SmartLinx to capture or collect Plaintiff's, the Class's, or the Subclass's biometric identifiers and/or biometric information.

121.    Unlike other companies doing business in Illinois, SmartLinx failed to take notice and follow the requirements of BIPA, even though the law was enacted in 2008, and numerous articles and court filings about the law's requirements were published before Defendants committed the legal violations alleged in this First Amended Complaint.

122.    SmartLinx's violation of BIPA was reckless or intentional or, in the alternative, negligent.

NOT AN OFFICIAL COPY

WHEREFORE, Plaintiff, the Class, and the Subclass pray for a judgment against SmartLinx as follows:

A.  Awarding liquidated or actual monetary damages, whichever is higher, to Plaintiff, the Class, and the Subclass for each violation of BIPA as provided by 740 ILCS 14/20(1)-(2);

B.  Enjoining SmartLinx from committing further violations of BIPA as authorized by 740 ILCS 14/20(4);

C.  Awarding Plaintiff's reasonable attorneys' fees and costs incurred in filing and prosecuting this action as provided by 740 ILCS 14/20(3); and

D.  Such other and further relief as this Court deems appropriate and just as provided by 740 ILCS 14/20(4).

## COUNT III – AGAINST OLA
### Violation of the Biometric Information Privacy Act (740 ILCS 14/15(a))
### (Class Action)

123.    Plaintiff realleges and incorporates the previous allegations of this First Amended Complaint.

124.    OLA is a "private entity" under BIPA. 740 ILCS 14/10.

125.    Plaintiff's and the Subclass's fingerprints qualify as "biometric identifier[s]" as defined by BIPA. 740 ILCS 14/10.

126.    OLA has "biometric information" from Plaintiff and the Subclass through its acquisition and retention of personal identifying information based on Plaintiff's and the Subclass's fingerprints.

127.    OLA violated BIPA by possessing Plaintiff's and the Subclass's fingerprints and personal identifying information based on their fingerprints without creating and following a written policy, made available to the public, establishing a retention schedule and destruction guidelines for its possession of biometric information derived from Plaintiff's and the Subclass's fingerprints.

128.    Unlike other Illinois companies, OLA failed to take notice and follow the requirements of BIPA even though the law was enacted in 2008 and numerous articles and court filings about the

22

law's requirements were published before OLA committed the legal violations alleged in this First Amended Complaint.

129.    As a result, OLA's violations of BIPA were reckless or intentional, or, in the alternative, negligent.

WHEREFORE, Plaintiff and the Subclass pray for a judgment against OLA as follows:

A.    Awarding liquidated or actual monetary damages, whichever is higher, to Plaintiff and the Subclass for each violation of BIPA as provided by 740 ILCS 14/20(1)-(2);

B.    Enjoining OLA from committing further violations of BIPA as authorized by 740 ILCS 14/20(4);

C.    Awarding Plaintiff's reasonable attorneys' fees and costs incurred in filing and prosecuting this action as provided by 740 ILCS 14/20(3); and

D.    Such other and further relief as this Court deems appropriate and just as provided by 740 ILCS 14/20(4).

## COUNT IV – AGAINST SMARTLINX
### Violation of the Biometric Information Privacy Act (740 ILCS 14/15(a))
### (Class Action)

130.    Plaintiff realleges and incorporates the previous allegations of this First Amended Complaint.

131.    SmartLinx is a "private entity" under BIPA. 740 ILCS 14/10.

132.    Plaintiff's, the Class's, and the Subclass's fingerprints qualify as "biometric identifier[s]" as defined by BIPA. 740 ILCS 14/10.

133.    SmartLinx has "biometric information" from Plaintiff, the Class, and the Subclass through its acquisition and retention of personal identifying information based on Plaintiff's, the Class's, and the Subclass's fingerprints.

134.    SmartLinx violated BIPA by possessing Plaintiff's, the Class's, and the Subclass's fingerprints and personal identifying information based on their fingerprints without creating and following a written policy, made available to the public, establishing a retention schedule and

destruction guidelines for its possession of biometric information derived from Plaintiff's, the Class's, and the Subclass's fingerprints.

135.    Unlike other Illinois companies, SmartLinx failed to take notice and follow the requirements of BIPA even though the law was enacted in 2008 and numerous articles and court filings about the law's requirements were published before SmartLinx committed the legal violations alleged in this First Amended Complaint.

136.    As a result, SmartLinx violations of BIPA were reckless or intentional, or, in the alternative, negligent.

WHEREFORE, Plaintiff, the Class, and the Subclass pray for a judgment against SmartLinx as follows:

A.    Awarding liquidated or actual monetary damages, whichever is higher, to Plaintiff and the Subclass for each violation of BIPA as provided by 740 ILCS 14/20(1)-(2);

B.    Enjoining OLA from committing further violations of BIPA as authorized by 740 ILCS 14/20(4);

C.    Awarding Plaintiff's reasonable attorneys' fees and costs incurred in filing and prosecuting this action as provided by 740 ILCS 14/20(3); and

D.    Such other and further relief as this Court deems appropriate and just as provided by 740 ILCS 14/20(4).

## COUNT V – AGAINST OLA
### Violation of the Biometric Information Privacy Act (740 ILCS 14/15(d))
### (Class Action)

137.    Plaintiff realleges and incorporates the previous allegations of this First Amended Complaint.

138.    OLA is a "private entity" under BIPA. 740 ILCS 14/10.

139.    Plaintiff's and the Subclass's fingerprints qualify as "biometric identifier[s]" as defined by BIPA. 740 ILCS 14/10.

140.    OLA has "biometric information" from Plaintiff, the Class, and the Subclass through

its acquisition and retention of personal identifying information based on Plaintiff's and the Subclass's fingerprints.

141.    OLA violated BIPA by disclosing or otherwise disseminating Plaintiff's and the Subclass's fingerprints and information based on their fingerprints to OLA's time keeping vendor, SmartLinx, without first obtaining their consent for that disclosure or dissemination.

142.    Unlike other Illinois companies, OLA failed to take notice and follow the requirements of BIPA even though the law was enacted in 2008 and numerous articles and court filings about the law's requirements were published before OLA committed the legal violations alleged in this First Amended Complaint.

143.    As a result, OLA's violations of BIPA were reckless or intentional or, in the alternative, negligent.

WHEREFORE, Plaintiff and the Subclass pray for a judgment against OLA as follows:

A.    Awarding liquidated or actual monetary damages, whichever is higher, to Plaintiff and the Subclass for each violation of BIPA as provided by 740 ILCS 14/20(1)-(2);

B.    Enjoining OLA from committing further violations of BIPA as authorized by 740 ILCS 14/20(4);

C.    Awarding Plaintiff's reasonable attorneys' fees and costs incurred in filing and prosecuting this action as provided by 740 ILCS 14/20(3); and

D.    Such other and further relief as this Court deems appropriate and just as provided by 740 ILCS 14/20(4).

**COUNT VI – AGAINST SMARTLINX**
**Violation of the Biometric Information Privacy Act (740 ILCS 14/15(d))**
**(Class Action)**

144.    Plaintiff realleges and incorporates the previous allegations of this First Amended Complaint.

145.    SmartLinx is a "private entity" under BIPA. 740 ILCS 14/10.

146.    Plaintiff's, the Class's, and the Subclass's fingerprints qualify as "biometric

NOT AN OFFICIAL COPY

identifier[s]" as defined by BIPA. 740 ILCS 14/10.

147.    SmartLinx has "biometric information" from Plaintiff, the Class, and the Subclass through its acquisition and retention of personal identifying information based on Plaintiff's, the Class's, and the Subclass's fingerprints.

148.    SmartLinx violated BIPA by disclosing or otherwise disseminating Plaintiff's, the Class's, and the Subclass's fingerprints and information based on their fingerprints, as noted in ¶¶ 1 – 99, including but not limited to in ¶¶ 39 – 42. These disclosures were made without first obtaining their consent for that disclosure or dissemination.

149.    Unlike other Illinois companies, SmartLinx failed to take notice and follow the requirements of BIPA even though the law was enacted in 2008 and numerous articles and court filings about the law's requirements were published before SmartLinx committed the legal violations alleged in this First Amended Complaint.

150.    As a result, SmartLinx's violations of BIPA were reckless or intentional or, in the alternative, negligent.

WHEREFORE, Plaintiff, the Class, and the Subclass pray for a judgment against SmartLinx as follows:

A.    Awarding liquidated or actual monetary damages, whichever is higher, to Plaintiff and the Subclass for each violation of BIPA as provided by 740 ILCS 14/20(1)-(2);

B.    Enjoining SmartLinx from committing further violations of BIPA as authorized by 740 ILCS 14/20(4);

C.    Awarding Plaintiff's reasonable attorneys' fees and costs incurred in filing and prosecuting this action as provided by 740 ILCS 14/20(3); and

D.    Such other and further relief as this Court deems appropriate and just as provided by 740 ILCS 14/20(4).

**COUNT VII – AGAINST SMARTLINX**
**Violation of the Biometric Information Privacy Act (740 ILCS 14/15(c))**
**(Class Action)**

NOT AN OFFICIAL COPY

151.    Plaintiff realleges and incorporates the previous allegations of this First Amended Complaint.

152.    SmartLinx is a "private entity" under BIPA. 740 ILCS 14/10.

153.    Plaintiff's, the Class's, and the Subclass's fingerprints qualify as "biometric identifier[s]" as defined by BIPA. 740 ILCS 14/10.

154.    SmartLinx has "biometric information" from Plaintiff, the Class, and the Subclass through its acquisition and retention of personal identifying information based on Plaintiff's, the Class's, and the Subclass's fingerprints.

155.    SmartLinx violated BIPA by selling, leasing, trading, or otherwise profiting from Plaintiffs', the Class's, and the Subclass's fingerprints and information based on their fingerprints without first obtaining their consent for that sale, lease, trade, or other form of profit.

156.    Unlike other Illinois companies, SmartLinx failed to take notice and follow the requirements of BIPA even though the law was enacted in 2008 and numerous articles and court filings about the law's requirements were published before SmartLinx committed the legal violations alleged in this First Amended Complaint.

157.    As a result, SmartLinx's violations of BIPA were reckless or intentional or, in the alternative, negligent.

WHEREFORE, Plaintiffs, the Class, and the Subclass pray for a judgment against SmartLinx as follows:

A.    Awarding liquidated or actual monetary damages, whichever is higher, to Plaintiffs, the Class, and the Subclass for each violation of BIPA as provided by 740 ILCS 14/20(1)-(2);

B.    Enjoining SmartLinx from committing further violations of BIPA as authorized by 740 ILCS 14/20(4);

C.    Awarding Plaintiffs' reasonable attorneys' fees and costs incurred in filing and prosecuting this action as provided by 740 ILCS 14/20(3); and

D.   Such other and further relief as this Court deems appropriate and just as provided by 740 ILCS 14/20(4).

Respectfully submitted,

Dated:  August 19, 2022                                    /s/ Max P. Barack
                                                          One of Plaintiff's Attorneys

**The Garfinkel Group, LLC**
Max P. Barack (max@garfinkelgroup.com)
Haskell Garfinkel (haskell@ garfinkelgroup.com)
6252 N. Lincoln Avenue, Suite 200
Chicago, Illinois 60659
Telephone: (312) 736-7991
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I filed the foregoing document with the clerk of the Court using the Illinois E-Filing System, which should further distribute a true and accurate copy of the foregoing to all counsel of record.

/s/ Max Barack



# EXHIBIT A

NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

VISION          PRODUCTS ▾

(https://www.smartlinx.com/)

CONTACT US (HTTPS://WWW.SMARTLINX.COM/CONTACT-US/)

SOLUTIONS ▾          SERVICES ▾          RESOURCES          COMPANY ▾



smartlinx (https://www.smartlinx.com/)

VISION          PRODUCTS ▾

SMARTLINX FOR LONG-

TERM CARE AND SENIOR          SERVICES ▾          RESOURCES          COMPANY ▾

SOLUTIONS ▾

LIVING

# We live and breathe long- term

smartlinx (https://www.smartlinx.com/)

care. Just like you.

VISION    PRODUCTS

SOLUTIONS    SERVICES    RESOURCES    COMPANY

NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

NOT AN OFFICIAL COPY

VISION          PRODUCTS ▾

SOLUTIONS ▾          RESOURCES ▾          COMPANY ▾

# Long-Term Care and Senior Living

**It takes a compassionate and resilient person to work in long-term and post-acute care.**

That's because some days, it can feel like everything is working against you. Thin margins, strict regulations, high turnover, fierce competition… Unfortunately, the list goes on. But you don't do this work because it's easy. You do it because it improves lives. How do we know?

## We know because our roots are based in compassionate

smartlinx (https://www.smartlinx.com/)

## compassionate care as well.

We started out as business owners in the industry. Frustrated and fed up by the same issues and inefficiencies many face today, we decided to create our own solution, and SmartLinx was born. Constantly innovating since our inception in 2000, we offer everything your team needs in a single, easy-to-manage system. We follow what's happening in LTPAC and provide solutions for the future of senior care management software.



LTPAC IS ALWAYS

NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

SOLUTIONS ▾          SERVICES ▾          RESOURCES          COMPANY ▾

VISION          PRODUCTS ▾

EVOLVING, AND SO ARE WE.

# Solutions Built Specifically for Your LTPAC Team

As thought leaders and advisors, it's our job to stay informed about this industry. That means constantly creating solutions that address what's next for Long Term Care—and providing you with the support and insight you need to navigate it with ease. This way, you can focus on the well-being of your staff and residents and providing quality care.

Whatever you need,

NOT AN OFFICIAL COPY

NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

SOLUTIONS ▾        SERVICES ▾

VISION        PRODUCTS ▾

RESOURCES        COMPANY ▾



from scheduling tricky three-day shifts to ensuring compliance, SmartLinx has you covered with personalized product offerings. Our nursing home management software is designed specifically to address the pressing needs of your industry, and you can count on us to support you in whatever your unique needs may be.

As innovators with decades of experience in serving your industry, we've built systems that tackle scheduling, employee retention, compliance, and other vital needs Our software solutions help you can manage your facility requirements confidently, knowing that every aspect of management is covered.

Experience a wide

smartlinx (https://www.smartlinx.com/)

VISION

PRODUCTS ▾

SOLUTIONS ▾          SERVICES ▾

RESOURCES

COMPANY ▾

range of benefits to address your requirements:

- Proactively identify open shifts and fill them without incurring overtime or calling an agency.
- Create and adjust schedules in real-time based on PPD census and acuity.
- Allow employees to self-serve their HR needs and pick up open shifts via mobile.
- Help manage CMS compliance with accurate attendance tracking and payroll.
- Produce accurate and auditable Payroll Based Journal reports in minutes.

## Proactive Scheduling

Create the ideal schedule every time.

NOT AN OFFICIAL COPY

(https://www.smartlinx.com/)

VISION          PRODUCTS ▾

SOLUTIONS ▾     SERVICES ▾          RESOURCES          COMPANY ▾

Smartlinx allows you to enjoy daily unit assignment capability, review totals by PPD or by hours, and more. We can help you to proactively identify open shifts and fill them on one accessible platform—without the need for an agency or the risk of incurring employee overtime.

With our system, you can manage your scheduling needs in minutes instead of hours. And with just a few clicks, you can create the schedules you want and put the right staff in the right shifts. Our system offers the flexibility you need in this fast-paced industry, making it easy to find a last-minute replacement or notify staff members of an adjustment.



NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

VISION                    PRODUCTS ▾

SOLUTIONS ▾        SERVICES ▾        RESOURCES ▾        COMPANY ▾

# Streamlined Operations

Manage daily tasks, from payroll to time and attendance, using a single, easy-to-use, and enterprise-wide console. Our solutions make completing daily work faster and more convenient with our single user-friendly console that offers access across the enterprise, so everyone can stay on the same page. Create and adjust schedules based on acuity and PPD census, all in real time.



Whatever your day-to-day operational needs, we have you covered with a system to do it all. Automated processing and real-

NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

time data allow you to stay ahead of your needs during every shift.

PRODUCTS ▾

SOLUTIONS ▾        SERVICES ▾        RESOURCES        COMPANY ▾

# Employee Engagement and Satisfaction

Access tools to develop a more connected, communicative, and empowered workforce to combat turnover and promote retention. When your staff needs HR assistance for time-off requests, job or salary history validation, or payroll inquiries, the intuitive self-service platform makes getting support faster and easier than ever



NOT AN OFFICIAL COPY

**smartlinx** (https://www.smartlinx.com/)

VISION

PRODUCTS ▾

SOLUTIONS ▾

SERVICES ▾

RESOURCES

COMPANY ▾

before.

With our software solution, you can motivate and engage your employees with tools to help them feel connected and stay on top of operational needs in real time.  A more fully engaged workforce builds stronger and more loyal employee morale, making your teams even more passionate about the work they do.

# Regulatory Compliance

Automate compliance to simplify PBJ reporting and earning your five-star rating. With our software, you can automate payroll-based journal (PBJ)

smartlinx (https://www.smartlinx.com/)



SOLUTIONS ▾        SERVICES ▾

VISION        PRODUCTS ▾

RESOURCES        COMPANY ▾

reporting and ensure full compliance with state and federal standards. Our system lets you generate complete reports in minutes, requiring just a few clicks to create a submission-ready XML file with all the information you need to report to the CMS and other governing organizations.

Accurate attendance tracking and payroll allow you to ensure full compliance with CMS standards, keeping you up to date on everything happening at your facility. Show that your institution is one your entire team can be proud of.

# Staff

NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

# Performance

VISION                    PRODUCTS ▾

SOLUTIONS    SERVICES ▾    RESOURCES    COMPANY ▾

Make day-to-day operations easier for your staff and boost performance & satisfaction with an intuitive platform that employees of all ages and technical backgrounds can use. From viewing open shifts to swapping shifts with colleagues, they can access a wide range of tools right from their mobile device. They can also access schedules, personal data, and paystubs in real-time directly through the Smartlinx platform.

# Explore Our Solutions

From scheduling three-shift days to automating PBJ reporting, it's all easier with SmartLinx. We've developed a customized solution that can address all your

NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

requirements seamlessly, saving you time and energy, and creating the space for you to focus on caring for your residents.

VISION                    PRODUCTS ▾

SOLUTIONS ▾    SERVICES ▾    RESOURCES    COMPANY ▾

## Schedule optimizer

Create the ideal schedule every time, enjoy daily unit assignment capability, review totals by PPD or by hours, and more.

Learn more > (https://www.smartli optimizer/)

## Streamlined operations

Manage daily tasks, from payroll to time and attendance, using a single, easy-to-use, and enterprise-wide console.

Learn more > (https://www.smartli operations/)

## Employee engagement

Access tools to develop a more connected, communicative, and empowered workforce to combat turnover and promote retention.

Learn more > (https://www.smartli engagement/)

## Regulatory compliance

Automate compliance to simplify PBJ reporting and earning your five-star rating.

Learn more >

## Staff performance

Use real-time analytics to increase efficiency and dive into the latest quality measures.

Learn more >

NOT AN OFFICIAL COPY

(https://www.smartli
compliance/) (https://www.smartlinx.com/performance/)

(https://www.smartli
nx.com/performance/)

VISION

PRODUCTS

SOLUTIONS

SERVICES

RESOURCES

COMPANY

# The trusted name in the senior care industry

Thousands of facilities provide better care thanks to SmartLinx, including:

NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

VISION        PRODUCTS ▾

"You need a vendor that
SOLUTIONS ▾    SERVICES ▾    RESOURCES        COMPANY ▾
knows the healthcare
industry, because if they
don't, then they're going
to be behind
implementing and
developing the
software. SmartLinx
knows the industry."

**Arthur Cooperberg**
Vice President of Finance, Essena Care

See what success with
SmartLinx looks like

VIEW SUCCESS

(HTTPS://RESOURCES.SMART

STORIES

NOT AN OFFICIAL COPY





NOT AN OFFICIAL COPY

**smartlinx** (https://www.smartlinx.com/)

VISION          PRODUCTS ▾

SOLUTIONS ▾        SERVICES ▾      RESOURCES ▾       COMPANY ▾

# Empower Your LTPAC Operations With Our Scheduling Software

Choose SmartLinx for trusted solutions to address your critical requirements for nursing home scheduling, senior care staffing, and other priorities. We're committed to offering innovative software that reduces your workload and helps you boost employee engagement and cost-efficiency across the institution. Whatever your needs, we provide industry-customized services that empower you and your team to provide the best care for your residents. If you're interested in learning more about how our software works for LTPAC requirements, contact us to get a demo today.

SCHEDULE A DEMO (HTTP://PAGES.SMARTLI

HSTC=113157595.0D4BF4213672AB54A7B8B73CF98012B1.1656070652338.1656070

smartlinx
(https://www.smartlinx.com/)

smartlinx

877-501-

### Subscribe to Our Newsletter

First Name *

Last Name *

Email *

SUBMIT

© 2022 SmartLinx Solutions. All Rights Reserved | Privacy Policy
(https://www.smartlinx.com/privacy-policy) | Terms & Conditions
(https://www.smartlinx.com/terms-and-conditions)

Sitemap (https://www.smartlinx.com/sitemap/)

**PRODUCTS**

Employee Schedule
optimizer/)

Time & Attendance
(https://www.smartlinx.com
and-attendance/)

**SERVICES** ▾

Workforce Analytics
(https://www.smartlinx.com/products/business-
analytics/)

Human Resources
(https://www.smartlinx.com/solutions/human-
resources/)

Payroll
(https://www.smartlinx.com/solutions/payroll/)

Human Capital Analytics
(https://www.smartlinx.com/products/business-
analytics/)

Mobile Shift Management
(https://www.smartlinx.com/products/shift-to-
go/)

Payroll Based Journal Report
(https://www.smartlinx.com/products/time-
director/)

Kiosks & Time Stations
(https://www.smartlinx.com/products/business-
optimization/)

Applicant Tracker
(https://www.smartlinx.com/products/applicant-
tracker/)

Benefits Administration
(https://www.smartlinx.com/products/benefits-
administration/)

**SOLUTIONS** ▾

**VISION**

**SERVICES** ▾

**RESOURCES**

**COMPANY**

**SERVICES**

Deployment
(https://www.smartlinx.com/)

Training
(https://www.smartlinx.com)

Customer Support
(https://www.smartlinx.com/
support/)

Workforce
Optimization
(https://www.smartlinx.com/)

**COMPANY**

**PRODUCTS** ▾

**RESOURCES**

**COMPANY**

**COMPANY**

Overview
(https://www.smartlinx.com/)

Leadership Team
(https://www.smartlinx.com/)

News
(https://www.smartlinx.com/
news)

Contact
(https://www.smartlinx.com/)

Careers
(https://www.

Support
__hstc=1

(https://www.smartlinx.com/
solutions/)



# EXHIBIT B

Abigail Lynn Chasteen
Will County Circuit Clerk
Twelfth Judicial Circuit Court
Electronically Filed
2020L 000826
Filed Date: 7/7/2022 12:33 PM
Envelope: 18577917
Clerk: RR

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## WILL COUNTY, ILLINOIS

DANTE SIMPSON, on behalf of    )
himself and all other persons     )
similarly situated, known and     )
unknown,                  )
                         )
           Plaintiff,    )     Case No. 2020 L 000826
   v.                  )
                         )
OUR LADY OF ANGELS        )
RETIREMENT HOME,        )
                         )
          Defendant.

### DEFENDANT'S MOTION FOR LEAVE TO FILE THIRD-PARTY COMPLAINT

NOW COMES Defendant, OUR LADY OF ANGELS, by its attorneys, TRESSLER LLP, and for her Motion to For Leave to File a Third-Party Complaint against SmartLinx Solutions, LLC states:

1.     On October 27, 2020, Plaintiff, Dante Simpson, on behalf of himself and all other persons similarly situated, known and unknown, filed his Complaint at Law against Defendant, Our Lady of Angels Retirement Home..

2.     On February 22, 2021, Defendant Our Lady of Angels Retirement Home filed a Motion to Dismiss.

3.     On June 3, 2021 the Court granted Plaintiff's Motion to Stay the proceedings in this case pending the results of the First District Court of Appeals' decision in *Mosby v. The Ingalls Memorial Hospital*, Case No. 1-20-0822 and the Illinois Supreme Court's decision in the *McDonald v. Symphony Bronzeville Park, LLC*, Case No. 126511 (Ill.)

4.     The stay was lifted on or about April 21, 2022 and Defendant's Motion to Dismiss has since been taken under advisement by the Court.

5.    As the statute of limitations will run on October 27, 2022, Defendant now seeks leave to file a Third-Party Complaint against SmartLinx Solutions, Inc. *See* proposed Third-Party Complaint, attached hereto as Exhibit A.

4.    Third party proceedings are governed by Section 2-406 of the Illinois Code of Civil Procedure which provides, in part, that with leave of court, a defendant may by third-party complaint bring in as a defendant a person not a party to the action who is or may be liable to him/her for all or part of the plaintiff's claim against him/her. 735 ILCS § 5/2-406.

WHEREFORE, Defendant, OUR LADY OF ANGELS RETIREMENT HOME, requests that this Honorable Court grant it leave to file a Third-Party Complaint and such further relief as this Court deems just and proper.

TRESSLER LLP


By:    /s/: *Jennifer A. Dancy*
       Counsel for Defendant


Colette Kopon (ckopon@tresslerllp.com) #6318262
Darcy Proctor (dproctor@tresslerllp.com) #6199731
Jennifer A. Dancy (jdancy@tresslerllp.com) #6339998
TRESSLER LLP
233 South Wacker Drive, 61st Floor
Chicago, Illinois 60606
312-627-4000
Fax: 312-627-1717

### PROOF OF SERVICE

The undersigned, being first duly sworn under oath, deposes and says that she served the foregoing **Motion for Leave** and the documents referred to therein by e-mailing a copy to the attorney(s) listed above on the 7th day of July 2022, in Chicago, Illinois, on or before 5:00 p.m.

/s/ Jennifer A. Dancy
**[x] Under penalties as provided by law pursuant to Ill. REV.STAT.CHAP. 110 SEC. 1-109, I certify that the statements set forth herein are true and correct.**

4879-6335-1591, v. 2

3

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## WILL COUNTY, ILLINOIS

DANTE SIMPSON, on behalf of himself          )
and all other persons similarly situated,    )
known and unknown,                           )
                                             )
                    Plaintiff,               )
                                             )        Case No. 2020 L 000826
          v.                                 )
                                             )
OUR LADY OF ANGELS                           )
RETIREMENT HOME,                             )
                                             )
                    Defendant.               )

---

OUR LADY OF ANGELS                           )
RETIREMENT HOME,                             )
                                             )
             Third-Party Plaintiff,          )
                                             )
          v.                                 )
                                             )
SMARTLINX SOLUTIONS, LLC                     )
                                             )
      Third-Party Defendant.                 )

### DEFENDANT OUR LADY OF ANGELS RETIREMENT HOME'S
### THIRD-PARTY COMPLAINT AGAINST SMARTLINX SOLUTIONS, LLC.

Defendant/Third-Party Plaintiff, Our Lady of Angels Retirement Home ("OLA") by and through its attorneys, Tressler, LLP, for its Third-Party Complaint against the Third-Party Defendant, SmartLinx Solutions, LLC ("SmartLinx"), states as follows:

### THE PARTIES

1.    The Defendant/Third-Party Plaintiff, OLA, is incorporated under the laws of the State of Illinois as a not-for-profit corporation a domestic not-for-profit corporation located in Joliet, Illinois (the "Subject Property").

2.      Upon information and belief, the Third-Party Defendant, SmartLinx Solutions, LLC is a New Jersey limited liability company providing workforce management and scheduling solutions in the long-term care and nursing marketplace. SmartLinx conducts its principal management operations (including information technology and human resources) in Iselin, New Jersey. Smart Linx provides workforce management and scheduling solutions services to long-term care and nursing entities throughout the State of Illinois.

## JURISDICITON AND VENUE

3.      The Court has subject matter jurisdiction over this lawsuit pursuant to Section 2-209(a)(3) of the Illinois Code of Civil Procedure because it arises from the transaction of business in the State of Illinois.

4.      This Court has personal jurisdiction over the parties because, during the relevant time period, Third-Party Plaintiff did business in Illinois and was registered to do business in Illinois.

5.      Venue is also proper, pursuant to Section 2-101 of the Illinois Code of Civil Procedure, because some part of the transaction out of which this lawsuit arose occurred in Will County, Illinois.

## GENERAL FACTUAL BACKGROUND

6.      On or about October 8, 2020, the Plaintiff, Dante Simpson ("Plaintiff") filed a Complaint at Law against OLA, Case Number 20L826, alleging violations of the Biometric Information Privacy Act (the "Lawsuit").

7.      On or about December 22, 2017, Third-Party Defendant, SmartLinx entered into a contract with OLA, #105073 ("the Agreement"), which included SmartLinx' Statement of Work ("SOW"), as well as various attachments, for the provision of "Subscription Services" in the form

of a biometric timeclock to be used by OLA. (*See Exhibit A – SOW and SAAS Terms and Conditions)*

8.      The Agreement states, in relevant part:

**Description of Work:**
Customer hereby engages SmartLinx to perform the Services as set forth in this SOW.

Subject to the provisions of this SOW, SmartLinx will perform the activities specified …to implement the Smartlinx Subscription Services…and to assess and improve the business processes that the Subscription Services support. Customer [OLA] has purchased a subscription license under the Order Schedule to use such Subscription Services. (Page 1)

**General Assumptions:**

1. This SOW does not include customization of the Subscription Services.
2. The Subscription Services are hosted by SmartLinx and accessed and used by the Customer [OLA] as a hosted service via the Internet. Configuration of the Subscription Services as contemplated under this SOW shall mean configuration for such use in such hosted environment.
3. The Configuration of the Time Clock utilizes off-the-shelf functionality which can be enabled or disabled (no customization). (Pages 1-2)

….

**Regulatory Reporting:**
…..

*SmartLinx Activities*
1.      SmartLinx will work collaboratively with Customer to determine how to adapt Customer's usage of WorkLinx. (Page 11)

…..

Time Clocks

*SmartLinx Activities*
1.      Configuration of the time clock based on the requirements established.
2.      Educating Customer [OLA] on best practices and methods for conducting enrollment activities. (Pages 12-13)

9.      The SAAS Terms and Conditions is an attachment to the December 22, 2017 SOW. This agreement sets forth the terms under which SmartLinx was to provide access to and use of its software.  (*See Exhibit A).*

10.     The SAAS Terms and Conditions Agreement States, in relevant part:

2.11 **Compliance with Laws.**   SmartLinx will comply with all applicable laws and regulations affecting the operation of SmarLinx' business, including any applicable export restrictions and data protection laws.

11.     The SmartLinx timeclock was in use at Our Lady of Angels from on or about May 2018 until November 2020.

### COUNT 1: BREACH OF CONTRACT

12.     OLA realleges and reasserts Paragraphs 1 through 9 as though fully set forth and plead herein.

13.     Pursuant to Attachment A of the SOW, SmartLinx, at all relevant times had a contractual duty to educate OLA personnel on best practices and methods for conducting enrollment activities and to "work collaboratively with OLA to determine how to adapt OLA usage of WorkLinx."

14.     Furthermore, the Agreement contractually obligates SmartLinx to "comply with all applicable laws and regulations affecting the operation of SmartLinx' business, including any applicable export restrictions and data protection laws."

15.     SmartLinx breached its duties under the Agreement and SOW by failing to perform their obligations thereunder, including but not limited to, failing to educate OLA personnel on best practices and methods in operating the biometric timeclock in a manner compliant with Illinois law.

16.    SmartLinx further breached its duties under the Agreement and SOW by failing to comply with all Illinois laws and regulations affecting the operation of the SmartLinx timeclock, including the Biometric Information Privacy Act, 740 ILCS 14.

17.    As a result of SmartLinx' breach, OLA has suffered and will continue to suffer damages, including, but not limited to the costs of investigation and attorneys' fees incurred in defending the lawsuit filed by Plaintiff, Dante Simpson.

WHEREFORE, the Defendant/Third-Party Plaintiff, OUR LADY OF ANGELS RETIREMENT HOME, prays that this Honorable Court enter judgment against Third-Party Defendant, SMARTLINX SOLUTIONS, LLC, for any and all liability, judgment, loss, or expense, including but not limited to, costs of investigation and attorneys' fees in connection with the lawsuit filed by Plaintiff, DANTE SIMPSON, against OUR LADY OF ANGELS RETIREMENT HOME, and for any other relief this Honorable Court deems just and appropriate.

## COUNT II: EQUITABLE AND IMPLIED INDEMNITY

18.    OLA realleges and reasserts Paragraphs 1 through 15 as though fully set forth and plead herein.

19.    Defendant/Third-Party Plaintiff did not cause or contribute to the damages alleged in Plaintiff's Complaint and the damages alleged by Plaintiff, if any, were caused in whole or in part by the actions and omissions of SmartLinx.

20.    Under the Agreement, SmartLinx assumed the responsibility for providing the biometric timeclock to Our Lady of Angels.

21.    The allegations in Plaintiff's complaint, which OLA denies and will continue to deny, allege violations of the Biometric Information Privacy Act 740 ILCS 14/1, through the use of the SmartLinx biometric timeclock.

22.    The actions of SmartLinx, and its actual, implied, and/or apparent agents, servants and employees were the cause of the injuries and damages alleged and claimed in Plaintiff's complaint.

23.    Defendant/Third-Party Plaintiff alleges that SmartLinx and/or its agents were negligent in the failing to take note of the shift in Illinois law governing the collection and use of biometric data.

24.    To the extent that damages are awarded to Plaintiff Simpson against Third-Party Plaintiff, Third-Party Plaintiff OLA is entitled to equitable and implied indemnity from SmartLinx for its acts and omissions, which caused said damages, including the amount of settlement, judgment, interest, costs, and/or fees incurred in this action.

25.    It has been necessary for Third-Party Plaintiff to retain the services of an attorney to defend against Plaintiff's Complaint and to bring forth this action. Accordingly, Third-Party Plaintiff is entitled to its reasonable attorneys' fees and court costs incurred herein.

WHEREFORE, the Defendant/Third-Party Plaintiff, OUR LADY OF ANGELS RETIREMENT HOME, prays that this Honorable Court enter judgment against Third-Party Defendant, SMARTLINX SOLUTIONS, LLC, for any and all liability, judgment, loss or expense, including but not limited to, costs of investigation and attorneys' fees, in connection with the lawsuit filed by Plaintiff, DANTE SIMPSON, against OUR LADY OF ANGELS RETIREMENT HOME, and for any other relief this Honorable Court deems just and appropriate.

## COUNT III: FRAUDULENT INDUCEMENT

26.    OLA realleges and reasserts Paragraphs 1 through 23 as though fully set forth and plead herein.

27.    At all relevant times, SmartLinx had a duty to refrain from making false statements of material fact regarding the Agreement and the SOW.

28.    Prior to OLA entering the Agreement with SmartLinx, a SmartLinx sales representative assured OLA leadership during an in-person meeting that use of the biometric timeclock would not expose Our Lady of Angels to liability under the Biometric Information Privacy Act.

29.    SmartLinx knew or had reason to know that this assurance was false, and its products could expose OLA to liability under the Biometric Information Privacy Act.

30.    SmartLinx' statements to OLA leadership were intended to induce OLA's reliance on said statements when entering into the Agreement.

31.    OLA reasonably relied on the representations of SmartLinx to its detriment in entering into the Agreement.

32.    OLA has suffered and will continue to suffer damages as a result of said reliance in the form of costs spent defending this lawsuit, including, but not limited to, costs of investigation and attorneys' fees in connection with the lawsuit filed by Plaintiff.

WHEREFORE, the Defendant/Third-Party Plaintiff, OUR LADY OF ANGELS RETIREMENT HOME, prays that this Honorable Court enter judgment against Third-Party Defendant, SMARTLINX SOLUTIONS, LLC, for any and all liability, judgment, loss or expense, including, but not limited to, costs of investigation and attorneys' fees, in connection with the lawsuit filed by Plaintiff, DANTE SIMPSON, against OUR LADY OF ANGELS RETIREMENT HOME, and for any other relief this Honorable Court deems just and appropriate.

## COUNT IV: CONTRIBUTION

33.    OLA realleges and reasserts Paragraphs 1 through 30 as though fully set forth and plead herein.

34.    At all relevant times, the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/1, et. seq. was in full force and effect. The Contribution Act gives tortfeasors the right to seek contribution from any other tortfeasor who would also be subject to liability for the same injury.

35.    If OLA is found to be liable to Plaintiff, then it is entitled to contribution from SmartLinx based upon one or more of the following acts or omissions which caused or contributed, in whole or in part, to the Plaintiff's alleged injuries, in the following ways:

   a.    Failing to educate OLA personnel on best practices and methods in operating the biometric timeclock in a manner compliant with Illinois law; and

   b.    Failing to comply with all Illinois laws and regulations affecting the operation of the SmartLinx, including the Biometric Information Privacy Act, 740 ILCS 14. Pursuant to 735 ILCS 5/2-1117, SmartLinx is jointly and severally liable for the damages due to Plaintiff, including but not limited to those in breach of the Third-Party Defendant's duty of ordinary care owed to Plaintiff;

36.    Third-Party Plaintiff alleges that it is entitled to contribution by SmartLinx for any and all liability that Third-Party Plaintiff may incur, may have paid, or may be required to pay to Plaintiff.

37.    It has been necessary for Third-Party Plaintiff to retain the services of an attorney to defend Plaintiff's Complaint and to bring this action. Accordingly, Third-Party Plaintiff is entitled to recover tis reasonable attorneys' fees and court costs incurred herein.

WHEREFORE, the Defendant/Third-Party Plaintiff, OUR LADY OF ANGELS RETIREMENT HOME, prays that this Honorable Court enter judgment against Third-Party Defendant, SMARTLINX, SOLUTIONS, LLC, for any and all liability, judgment, loss or expense, including, but not limited to, costs of investigation and attorneys' fees, in connection with the lawsuit filed by Plaintiff, DANTE SIMPSON, against OUR LADY OF ANGELS RETIREMENT HOME, and for any other relief this Honorable Court deems just and appropriate.

Respectfully submitted,

This 7th day of July, 2022                    By: /s/ Jennifer A. Dancy _____

Colette L. Kopon
Darcy Proctor
Jennifer Dancy
Tressler LLP
233 S. Wacker Drive
61st Floor
Chicago, IL 60606
ckopon@tresslerllp.com
dproctor@tresslerllp.com
jdancy@tresslerllp.com
Ph: 312-627-4158

         

**WorkLinx**™

Time and Attendance · Schedule Optimizer · Payroll · Business Analytics · HR · Attest · ACA Director · Employee Self-Service · Mobile



# Statement of Work prepared for Our Lady of Angels Retirement Community, An Illinois Not for Profit Corporation

Proposal Date: 12/22/2017

**SmartLinx Solutions LLC.**
333 Thornall Street
4th Floor
Edison NJ 08837
Phone +1 732-851-4433
www.smartlinxsolutions.com

©2016 SmartLinx Solutions LLC. Proprietary and Confidential


EXHIBIT
A

| Home Customer: | Our Lady of Angels Retirement Community, An Illinois Not for Profit Corporation |
|---|---|
| Contract #: | 105073 |
| Effective Date: | 12/22/2017 |

# SmartLinx Statement of Work (SOW)

## 1.   Description of Work

This Statement of Work ("SOW"), is issued under the Contract # noted above.   The terms of the Agreement as well as any attachments, exhibits and appendices attached hereto, and the terms of any sales order thereunder applicable to this SOW, are hereby incorporated by reference into this SOW. In case of conflict, the terms of the Agreement shall prevail unless this Statement of Work expressly supersedes any specified provisions of the Agreement. Unless otherwise defined herein, all capitalized terms shall have the meaning set forth in the Agreement.   Upon execution of this SOW by both parties, Customer hereby engages SmartLinx to perform the Services as set forth in this SOW. The "SOW Effective Date" shall mean the date of the last of the required signatures below.

Subject to the provisions of this SOW, SmartLinx will perform the activities specified in Section 3 through 5 to be performed by SmartLinx ("Professional Services") to implement the SmartLinx Subscription Services indicated in Section 2 below ("Subscription Services") and to assess and improve the business processes that the Subscription Services support. Customer has purchased a subscription license under the Order Schedule to use such Subscription Services.  This SOW defines the scope, the resources, and the activities required to complete this project.

Any services or deliverables not directly described in this SOW as the responsibility of SmartLinx will be considered outside the scope of this SOW. Without limitation and except as otherwise expressly included in Professional Services in Section 3, the following is out of scope of this SOW: Any changes to Customer requirements in the Configuration Document as delivered by SmartLinx.

## 2.   Project Overview

SmartLinx works collaboratively with Customer to deploy products and functionality defined within this agreement. Products and functionality will be deployed in a mutually agreed upon schedule established at project kickoff based on best practices and recommended approach provided by SmartLinx.

## 3.   General Assumptions and Responsibilities

### General Assumptions

1.  SmartLinx shall configure the Subscription Services in accordance with previously defined requirements. This SOW does not include customization of the Subscription Services.
2.  As between the parties, Customer is solely responsible for interpreting and complying with laws applicable to the conduct of its business, including in connection with its use of SmartLinx products or services.

©2017 SmartLinx Solutions LLC.
Proprietary and Confidential



3. The Subscription Services are hosted by SmartLinx and accessed and used by the Customer as a hosted service via the Internet. Configuration of the Subscription Services as contemplated under this SOW shall mean configuration for use in such hosted environment.

4. The configuration of the Time Clock utilizes off-the-shelf functionality which can be enabled or disabled (no customization).

## Customer Responsibilities

1. Estimated effort within the SOW assumes fulfillment of Customer responsibilities as defined; in the event that SmartLinx must fulfill Customer responsibilities to complete project execution, effort required and cost will increase.  SmartLinx will notify Customer of the need for additional hours as soon as it is reasonably practicable.

2. Provide formal sign off to SmartLinx acknowledging Go-Live date.

3. Customer must participate in necessary training in order to reach proficiency in performing administration tasks, such as user management.  In order to facilitate this proficiency, training sessions listed within the Order Schedule and Section 9 below are mandatory.   Additional training sessions may be added, as needed, at additional cost.

4. Throughout the engagement and after Go-Live has occurred, Customer will be responsible for performing administration tasks covered during training, including (but not limited to): user management, updating settings and filters on configurable reports, and the management and update of master data imported during Master Data Collection and Import.

5. Customer will identify an executive steering committee that will be available when necessary to make decisions on changes relating to the Professional Services, such as changes of policy, procedures or cost.

6. Customer will review and approve the proposed high level timeline; Customer and SmartLinx will work collaboratively to update the timeline on a periodic basis to drive successful completion of activities and prevent delay of services.

7. Customer will independently lead a user acceptance testing effort based on the requirements and timeline communicated by SmartLinx, understanding that failure to conduct testing and provide feedback in a timely manner constitutes acceptance of delivered work.

8. Customer reviews budget status reports from SmartLinx and works collaboratively to ensure remaining work effort is aligned with remaining budget.

9. Inform SmartLinx of any and all Customer circumstances or events that may interfere with or hinder the availability of Customer resources during the projected timeline. These events include but are not limited to planned time off, policy changes, etc.

## 4.   Scope of Professional Services

The scope of Professional Services for this project includes the implementation of products, as noted in the Order Schedule.

Deployment and configuration of the Subscription Services is based on SmartLinx's standard Implementation Methodology, defined in Attachment A.

©2017 SmartLinx Solutions LLC.
Proprietary and Confidential



## Inclusions / Exclusions

Based on the defined scope of the engagement, the following scope inclusions and exclusions are specified.

*Included in Scope*

1. Deployment of a workforce management solution for up to two hundred (200) employees at up to one (1) facilities
2. Pilot and copy deployment; pilot facility will be configured and then duplicated to successive facility rollouts
3. Standard, out-of-the-box SmartLinx reports for all purchased products
4. Payroll configuration of up to one (1) federal tax IDs
5. Configuration to accommodate up to five (5) pre-tax deductions
6. Rule and policy configuration to enable Customer to pay in up to one (1) states
7. Configuration and deployment to support 1095C reporting
8. Configuration and deployment to support PBJ submission to the Centers for Medicare and Medicaid Services (CMS)
9. Configuration and deployment of hours and earnings export to 3rd Party Payroll
10. Configuration and deployment of employee metadata import from HR system
11. Configuration and deployment of a standard accrual balance import

*Excluded from Scope*

1. Configuration and deployment of a standard General Ledger (GL) export
2. Import of legacy data to support 1095C reporting for past periods
3. Import of legacy data to support PBJ reporting for past periods

## 5.   Project Commencement

The parties shall jointly agree in writing on the date for commencement of the project in this SOW, which shall be within thirty (30) days from the SOW Effective date of 12/22/17. Notwithstanding the preceding sentence, SmartLinx reserves the right not to commence services until the receipt of a valid purchase order for all of the work to be performed hereunder and, if applicable, until receipt by SmartLinx of payment of all amounts invoiced by SmartLinx upon execution of the applicable Order Schedule and due prior to the commencement of the project.

©2017 SmartLinx Solutions LLC,
Proprietary and Confidential



# Attachment A - SmartLinx Standard Implementation Methodology

The following sections apply to products if purchased; otherwise they should be ignored.

## Master Data Collection and Import

*Assumptions*

1. Customer's master data is complete, accurate, and can be compiled into SmartLinx's prescribed format to ensure the data can be imported with minimal manipulation and/or import re-tries which will cause delay of services.

2. Exports from existing legacy systems which will be imported into the WorkLinx(TM) suite will be translated into the data formats prescribed by SmartLinx by the Customer.

3. One active record will be imported per employee.

4. Import of master data will be performed only once (any missed data must be manually entered by Customer).

*SmartLinx Activities*

1. Provide feedback to customer regarding the sourcing and manipulation of any master data to ensure that imports meet SmartLinx's requirements and support corrections of master data within the agreed upon timeline.

2. Review master data supplied by Customer and provide exhaustive instructions to Customer for master data preparation: conversion, clean-up, or normalization which must be performed prior to import.

3. Smartlinx will import a validated master data workbook into the WorkLinx(TM) product suite.

*Customer Activities*

1. Extraction of any data which will be imported into the WorkLinx(TM) suite from any source systems.

2. Supply of the data to be imported into the master data spreadsheet and resolution of any validation errors arising due to data quality issues.

3. Perform any activities related to master data preparation prescribed by SmartLinx, understanding that failure to do so within the approved timeline may result in delay of services.

4. Customer will provide master data spreadsheets covering all of the data requirements specified by SmartLinx for all of the in-scope products, organizations, and facilities as specified throughout as a master data requirement.

## Time and Attendance

*Assumptions*

©2017 SmartLinx Solutions LLC.
Proprietary and Confidential

1. The customer will supply all master data required for the Time and Attendance product consistent with the assumptions, activities, and deliverables described in the Master Data Collection and Import section.
2. The person responsible for reviewing and approving time cards, such as a Payroll Coordinator, will be available and participatory throughout requirements definition, configuration, and testing.
3. Requests for customization or modification of any reports or existing screens are out of scope for Time and Attendance deployment.
4. Importing of any schedules from any other software outside SmartLinx are out of scope for Time and Attendance deployment.
5. Automation of on-call and call-back related pay rules is considered out of scope.
6. Customer will adopt WorkLinx(TM) standard pay practice configuration model. Pay rules such as shift differentials, and any other additional pay, to be set up as standalone earning codes configured to pay at the differential amount and not incorporated into a single earning code inclusive of both the base rate and the differential amount.
7. Customer's current business processes may need to be adapted to utilize off-the-shelf functionality of the WorkLinx product suite
8. Overtime to be calculated per customer defined thresholds and to apply on the specific timecard where thresholds are exceeded.

*SmartLinx Activities*

1. SmartLinx will work collaboratively with Customer to discover and define business processes such as who is responsible for review and approval of time cards, workflow time cards follow, etc.
2. SmartLinx will work collaboratively with Customer to define access requirements, such as who can review employee records or sensitive pay-related information.
3. SmartLinx will work collaboratively with customer to determine how to adapt customer's usage of WorkLinx(TM) to template-based user roles and security settings.
4. SmartLinx will work with Customer to revisit earning codes which may need to be reconsidered and re-configured based on key decisions made during the deployment of the Time and Attendance product.
5. SmartLinx will provide a pay policy definition document, which details how individual pay rules and shift differentials have been configured to enable customer testing.

*Customer Activities*

1. Customer will participate in requirements gathering and testing workshops as requested by SmartLinx.

## Schedule Optimizer

*Assumptions*

1. The customer will supply all master data required for the Schedule Optimizer product consistent with the assumptions, activities, and deliverables described in the Master Data Collection and Import section.
2. Export of schedule out of SmartLinx into a third party vendor is out of scope.

*SmartLinx Activities*

©2017 SmartLinx Solutions LLC.
Proprietary and Confidential

1. SmartLinx will work collaboratively with Customer to discover and define business processes such as who is responsible for creating shifts and units.
2. SmartLinx will work collaboratively with Customer to setup shift groups and schedule start date.
3. SmartLinx will work collaboratively with Customer to define access requirements, such as who can review employee records or sensitive pay-related information.
4. SmartLinx will work collaboratively with customer to determine how to adapt customer's usage of WorkLinx(TM) to template-based user roles and security settings.
5. SmartLinx will perform the configuration for the Schedule Optimizer product.

*Customer Activities*

1. Customer will participate in requirements gathering and testing workshops as requested by SmartLinx.
2. Customer will participate in Schedule Optimizer boot camp as per the agreed upon timeline.
3. Customer will perform the scheduling process collaboratively with SmartLinx as per the agreed upon timeline to ensure adequate knowledge exists to manage the system after Go-Live.
4. Customer will begin utilizing the Schedule Optimizer product in a non-production capacity as dictated by the approved timeline to ensure they are adequately knowledgeable in its function prior to the cutover to Production.

## Human Resources

*Assumptions*

1. Except as explicitly defined in this Statement of Work, Integrations with external or 3rd party vendors, including carriers, are out of scope.
2. Benefit integration with SmartLinx Payroll is limited to benefits with either flat rates or single level option deductions.
3. Requests for customization or modification of any reports or existing screens are out of scope for Human Resources components.
4. SmartLinx led configuration to be limited to the Benefits component of Human Resources.

*SmartLinx Activities*

1. SmartLinx will work collaboratively with Customer to define Human Resources product Benefits components requirements including: Benefits - Plan names, plan cost and withholding rates, eligibility rules

*Customer Activities*

1. Customer will participate in requirements gathering and testing workshops as requested by SmartLinx.
2. Customer is responsible for performing user acceptance testing as specified in the project timeline.
3. Customer is responsible for configuring applicable client configurable options, including: forms, company property, OSHA/injury codes.

©2017 SmartLinx Solutions LLC.
Proprietary and Confidential




4. As necessitated by Customer's requirements, Independently configure any Human Resources components enabled by SmartLinx.
5. Customer performs all previously specified Human Resources client configuration.
6. Customer is to complete any requirement gathering documentation for all in-scope Human Resources components within discussed timeline.

## Payroll

*Assumptions*

1. The Payroll product delivered will utilize out-of-the-box functionality with limited configuration (and no customization).
2. The year-to-date (YTD) import is not included with this effort. If customer requires YTD conversion, the conversion will be estimated separately and covered under a project change request.
3. Customer will be responsible for ensuring 3rd Party Check provider is able to conform checks produced to templates SmartLinx will provide.
4. Customer will use pre-printed check stock; magnetic ink character recognition (MICR) printing will not be supported.
5. Scope assumes no more than one (1) ACH layout to be deployed.
6. Configuration of age banded medical plans is excluded from scope.
7. Scope assumes no more than four (4) payroll definitions will be configured.
8. Scope explicitly excludes design and deployment of custom reports.
9. Only standard user roles will be configured.

*SmartLinx Activities*

1. SmartLinx will work collaboratively with customer on configuration of payroll environment, setup of company master (e.g., org structure, taxing, deduction, earnings master, banking, ACH and standard check layouts).
2. Customer training on system level, employee level, payroll processing and validation of all payroll related items (parallel payrolls can double as additional training)
3. SmartLinx to configure and provide accurate gross to net payroll earnings by go-live date.
4. Solution Delivery will provide assistance through (2) two live payrolls as necessary.
5. Solution Delivery will perform a timely and thorough turnover to support team.

*Customer Activities*

1. Provide requested and accurate payroll master data including taxing, direct deposit and deductions, a timely manner, using SmartLinx formats.
2. Customer to provide additional employee Master Data items include org structure, salary info, personal information as requested by SmartLinx.
3. Customer is responsible for timely validation and approval of configuration and data.
4. Year to Date (YTD) data has to be provided in a format prescribed by SmartLinx for import otherwise it is assumed customer will enter this data on their own manually within Payroll.
5. Customer is responsible for completion of test scripts and provision of feedback within discussed timeframe.
6. Customer is expected to actively partake as necessary in conversion and validation process.

©2017 SmartLinx Solutions LLC.
Proprietary and Confidential



## Affordable Care Act (ACA) Director

*Assumptions*

1. Customer will attend ACA Director training, and provide ACA measurement and stabilization period to Smartlinx in a standard Smartlinx prescribed format.

*SmartLinx Activities*

1. SmartLinx will work collaboratively with Customer to configure and setup ACA Director as well as to setup of the task to populate data in ACA Director.

2. SmartLinx will work collaboratively with Customer to determine how to adapt Customer's usage of WorkLinx(TM).

*Customer Activities*

1. None.

## Regulatory Reporting

*Assumptions*

1. Customer is responsible for validating 1095C data prior to submission to IRS.

2. Scope of delivery assumes no more than three (3) total medical benefit plans.

3. Customer is responsible for work associated with validating Payroll Based Journal reporting prior to submission to Centers for Medicare and Medicaid Services (CMS).

4. Scope of delivery assumes standardized position structure across all facilities.

*SmartLinx Activities*

1. SmartLinx will work collaboratively with Customer to determine how to adapt Customer's usage of WorkLinx(TM).

*Customer Activities*

1. Customer will validate 1095C data prior to submission to IRS.

2. Customer will validate Payroll Based Journal reporting prior to submission to Centers for Medicare and Medicaid Services (CMS).

3. Customer will upload Payroll Based Journal reports directly to CMS website.

## Mobile Employee Self Service

*Assumptions*

1. Mobile Employee Self Service requires at least Time and Attendance Product as a prerequisite.

2. Customer requirements do not necessitate modification to pre-existing, out-of-the-box workflows supplied with Mobile Employee Self Service.

*SmartLinx Activities*

1. SmartLinx will provide introductory walk through of employee account setup and ensure proper access is granted.

*Customer Activities*

1. Customer will train employees on the use of Mobile Employee Self Service.

©2017 SmartLinx Solutions LLC.
Proprietary and Confidential



## Accruals

*Assumptions*

1. The Customer will provide all documented accrual policies required for the Accruals product.
2. Any changes to pre-existing policies will be provided during initial data gathering stage.
3. Scope of Comp time calculations restricted to Comp time usage tracking.

*SmartLinx Activities*

1. SmartLinx will work collaboratively with Customer to discover and define accrual policy schedules and requirements.
2. SmartLinx will work collaboratively with Customer to setup accrual policy definitions.
3. SmartLinx will work collaboratively with Customer to define access requirements, such as who can review employee records or sensitive pay-related information that may be displayed within Accruals product.
4. SmartLinx will work collaboratively with customer to determine how to adapt customer's usage of the Accruals product and its integration with Time and Attendance, Schedule Optimizer and Payroll.
5. Smartlinx will complete configuration and preliminary testing for the Accruals product.

*Customer Activities*

1. Customer will participate in requirements gathering and conduct necessary testing as requested by SmartLinx.
2. Customer will participate in Accruals overview training as per the agreed upon timeline and proceed to assign configured policies to employees once overview has been provided.
3. Customer is to provide starting balances to SmartLinx as per the agreed upon timeline.
4. Customer will work collaboratively with SmartLinx as per the agreed upon timeline to ensure adequate knowledge exists to manage the system after Go-Live.

## Time Clocks

*Assumptions*

1. Customer will present all required configuration updates to the Time Clock based on the approved project timeline in order to meet the Time Clock configuration lock milestone.
2. Modifications to the host platform for time clock communications will not be altered in the context of the deployment, and all preconfiguration of the time clock as shipped will be utilized with no modification.
3. Only time clocks which were specifically preconfigured and shipped for this deployment will be utilized for this deployment (clock swaps from other facilities require additional, out-of-scope effort).
4. The number of employees to be configured for each individual Time Clock is within maximum limit of employees for the hardware.

*SmartLinx Activities*

1. Configuration of the time clock based on the requirements established.

©2017 SmartLinx Solutions LLC.
Proprietary and Confidential

2. Educating Customer on best practices and methods for conducting enrollment activities.
3. SmartLinx will provide updated pay policy and network setting requirements for the deployed Time Clocks.
4. SmartLinx will provide time clocks configured to the specification determined during requirements gathering.

*Customer Activities*

1. Completion of Form 11-D which details the specifications for installation: network configuration, mounting bracket configuration, physical device configuration, and shipping information.
2. Customer is responsible for conducting a review of the operation of the Time Clock in a pre-Go Live environment and providing feedback to SmartLinx to reconfigure as needed.
3. The preparation of the mounting area for the time clock as well as the physical installation of the clock and performance pre-check activities, such as ensuring a functioning network connection and in specification electrical hookup.
4. Troubleshooting of any electrical, network, or facility-related issues preventing the successful in specification deployment of the physical Time Clock.
5. Assignment or adjustment of any badge IDs which were not specified during the employee master data import.
6. Execution of the enrollment process for all employees at all facilities.
7. Customer will physically install and pre-check time clocks.

## Integrations

*Assumptions*

1. Customer's import and export data requirements conform to SmartLinx's provided specifications.
2. Customer is solely responsible for manipulating, converting, splitting, or merging any data imports or exports to conform to the specifications provided by SmartLinx.
3. Data exchange between SmartLinx and 3rd party systems will be performed by placing the file into a secure FTP location which can be accessed using industry standard host key authentication.
4. Import of data will only be performed in the context of the project timeline; once the import is accepted or the agreed upon deadline for import has passed, no further re-import will be permissible.

*SmartLinx Activities*

1. Perform high-level requirements review to define requirements for each interface.
2. Review of customer-supplied sample files (for imports) and specifications (for exports); SmartLinx provides feedback to Customer regarding suitability of proposed sample files and specifications.
3. Deployment of interfaces to drive in-scope imports and exports.
4. Training of end users on how to perform exports using the front-end UI, where applicable.

*Customer Activities*

1. Review of imported data (where applicable) in either a test or Production environment; acceptance of the imported data as per the agreed upon project timeline.

©2017 SmartLinx Solutions LLC.
Proprietary and Confidential



2. Review of the process of generating exports through the front-end UI.
3. Providing of feedback related to any discrepancies or issues found with imported data to occur during the agreed upon project timeline.
4. Customer will provide a sample file for any in-scope imports in alignment with the agreed upon project timeline.
5. Customer will provide a copy of the proposed specification for exports (i.e. column names, data types, length specifications) in alignment with the agreed upon project timeline.

©2017 SmartLinx Solutions LLC.
Proprietary and Confidential



## SAAS TERMS AND CONDITIONS AGREEMENT

This Agreement (**"Agreement"**) is entered into as of December 22nd, 2017 (the **"Effective Date"**), between **SmartLinx Solutions, LLC**, a Delaware limited liability company having offices at 333 Thornall Street, 4th Floor, Edison, NJ 08837 (**"SmartLinx"**) and Our Lady of Angels Retirement Community, An Illinois Not for Profit Corporation, having offices 1201 Wyoming Avenue, Joliet, Illinois 60435 (the **"Customer"**).

This Agreement sets forth the terms under which SmartLinx will provide Customer with access to and use of certain software-as-a-service offering(s) identified in the applicable Order Schedule (each a **"Subscription Service"** and collectively, the **"Subscription Services"**) and related Equipment. Any updates or enhancements to a Subscription Service provided as part of Maintenance for same will be deemed to be part of such Subscription Service. The Subscription Services are hosted by SmartLinx and accessed and used by Authorized Users via the Internet.

**1. Definitions.**

**"Administrator(s)"** means the Authorized User(s) designated by Customer who are responsible for administering the Subscription Service and who are issued an Administrator login by SmartLinx or Customer.

**"Affiliates"** means any entity that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with a party to this Agreement, by way of majority voting equity ownership.

**"Agreement"** means these terms and conditions, together with any and all Order Schedules referencing these terms and conditions, the Exhibits attached hereto and any other statements of work, exhibits or appendices thereto, whether attached or incorporated by reference.

**"Authorized Users"** means individuals who are authorized by Customer to use the Subscription Service, for whom subscriptions to a Subscription Service have been purchased on an Order Schedule, and who have been supplied user identifications and passwords by Customer.

**"Customer"** means the customer entity that has executed an Order Schedule with SmartLinx.

**"Customer Data"** means all electronic data or information submitted by Customer or its Authorized Users to and stored by the Subscription Service.

**"Documentation"** means the administrative and user manuals published by SmartLinx and provided by SmartLinx to Customer with the Subscription Service, which may be updated from time to time, but excluding any sales or marketing materials.

**"Electronic Communications"** means any information transmitted in whole or part, electronically received and/or transmitted through the Subscription Service.

**"Equipment"** shall mean the hardware components (if any) described in an Order Schedule and supplied by SmartLinx hereunder.

**"Equipment Maintenance"** means and consist solely of the services described in the SmartLinx Equipment Maintenance Guide.

**"Equipment Maintenance Guide"** means the SmartLinx Equipment Maintenance Guide in effect at the start of then-current maintenance period. A copy of the current Equipment Maintenance Guide is attached hereto as Exhibit C, which is hereby incorporated by reference.

**"Facility"** means the Customer's facility location specified in any Order Schedule.

**"Initial Term"** means the initial subscription term specified in the applicable Order Schedule, excluding any renewals terms.

**"Order Schedule"** means an ordering document which references this Agreement and is executed by both parties which specifies the Subscription Service, implementation services, Equipment, and/or Equipment Maintenance to be ordered by Customer and provided by SmartLinx subject to the terms of this Agreement.

 **"Term"** has the meaning set forth in Section 10.1 below.

**"Third Party Services"** means applications or services that are provided by third parties, and interoperate with the Subscription Service.

**2. Subscription Service License Terms**

**2.1 License.** Subject to the terms of this Agreement and payment of the applicable fees, SmartLinx grants to Customer a limited, non-exclusive, non-transferable license to permit Authorized Users to use the Subscription Service for the duration of the Term specified in the applicable Order Schedule, subject to the use parameters specified in such Order Schedule, and solely for the internal business operations of Customer and its Affiliates.

**2.3 Authorized Users: Passwords, Access, and Notification.** Customer, through its Administrator, shall authorize access to and assign unique passwords and user names up to the number of Authorized Users purchased by Customer on the Order Schedule. Authorized User logins are for designated Authorized Users and cannot be shared or used by more than one Authorized User. Customer will

be responsible for the confidentiality and use of Authorized User's passwords and user names. SmartLinx will act as though any Electronic Communications it receives under Customer's passwords, user name, and/or account number will have been sent by Customer. Customer shall use commercially reasonable efforts to prevent unauthorized access to or use of the Subscription Service and shall promptly notify SmartLinx of any unauthorized access or use of the Subscription Service and any loss or theft or unauthorized use of any Authorized User's password or name and/or Subscription Service account numbers.

**2.4 Use of the Subscription Service.** Customer is responsible for all activities and Electronic Communications conducted by its Authorized Users and for its Authorized Users' compliance with this Agreement, including the content of all Customer Data. Customer will not: (a) sell, lease, license or sublicense the Subscription Service; (b) introduce into or transmit through the Subscription Service any virus, worm, trap door, back door, and other harmful or malicious code, files, scripts, agents, or programs; (c) transmit or store infringing material in the Subscription Service; (d) send any Electronic Communication from the Subscription Service that is unlawful, harassing, libelous, defamatory or threatening. Except as permitted by this Agreement, no part of the Subscription Service may be copied, republished, displayed in any form or by any means. Customer agrees not to access the Subscription Service by any means other than through the interfaces that are provided by SmartLinx.

**2.5 Third Party Services.** SmartLinx or third party providers may offer Third Party Services to Customer hereunder. Customer acknowledges and understands that the use of such Third Party Services shall be subject to separate terms and conditions as set forth on an Order Schedule or as otherwise provided to Customer. Except as expressly set forth in the Order Schedule, SmartLinx does not warrant any such Third Party Services. If Customer installs or enables Third Party Services for use in conjunction with the Subscription Service, Customer agrees that SmartLinx may allow such third party providers to access Customer Data as required for the interoperation of such Third Party Services with the Subscription Service, and any exchange of data or other interaction between Customer and a third party provider is solely between Customer and such third party provider. Finally, the continuing availability of the Third Party Services is subject to the continued effectiveness and terms of the contract between SmartLinx and the third party provider.

**2.6 Security.** Each party will use commercially reasonable measures to maintain and enforce physical and logical security procedures to prevent unauthorized access to and/or use of the Subscription Service and the Customer Data. SmartLinx will use commercially reasonable measures to secure and defend the Subscription Service against "hackers" and others who may seek to modify or access the Subscription Service or the Customer Data

without authorization. SmartLinx will use commercially reasonable efforts to remedy any breach of security or unauthorized access. SmartLinx shall not be responsible or liable for the disclosure of or unauthorized access to Customer Data caused by Customer, its Authorized Users, Customer's affiliates, or the employees, agents or contractors of any of the foregoing.

**2.7 Transmission of Data.** The Subscription Service allows Customer to send and receive Electronic Communications and Customer understands that the technical processing and transmission of Customer's Electronic Communications is fundamentally necessary to use of the Subscription Service. Customer acknowledges and understands that Customer's Electronic Communications will involve transmission over the Internet, and over various networks, only part of which may be owned and/or operated by SmartLinx. SmartLinx is not responsible for any Electronic Communications and/or Customer Data which are delayed, lost, altered, intercepted or stored during the transmission of any data across networks not owned and/or operated by SmartLinx, including but not limited to, the Internet and Customer's local network.

**2.8 Service Level.** SmartLinx's commitment to the availability of the Subscription Service and related matters are specified on the "Service Level Agreement" attached hereto as Exhibit A (the **"Service Level Agreement"** or **"SLA"**), which is hereby incorporated by reference.

**2.9 Maintenance and Support for Subscription Service.** SmartLinx will provide Maintenance and Support for the Subscription Service as described on the "SAAS Maintenance Guide" attached as Exhibit B hereto (**"SAAS Maintenance and Support"**), which is hereby incorporated by reference. SAAS Maintenance and Support is included in the subscription fees paid by Customer for the Subscription Service.    SmartLinx also offers training classes, implementation services, consultation and enhanced support services for additional fees.

**2.10 Implementation Services.** Implementation and training services ordered by Customer as set forth in the applicable Order Schedule will be performed in accordance with SmartLinx's customary practices for the level of services purchased. Implementation is performed remotely unless otherwise specified.

**2.11 Compliance with Laws.** SmartLinx will comply with all applicable laws and regulations affecting the operation of SmartLinx' business, including any applicable export restrictions and data protection laws. Customer will be solely responsible: (i) for compliance by Customer with all laws and governmental regulations affecting Customer's business, (ii) for using the Subscription Services in a manner to assist it in complying with same, and (iii) the content and accuracy of all reports and documents prepared in whole or in part by using the Subscription Services.  Customer will review any calculations made by using the Subscription Services and satisfy itself that those calculations are

# EXHIBIT C

# smartlinx



# Customer Success Story

## Greek American Ensures Compliance with SmartLinx Solutions

Greek American Rehabilitation & Care Centre used SmartLinx workforce management suite to successfully defend against a regulatory complaint in minutes and prove compliance to Centers for Medicare and Medicaid Services (CMS) regulations.

When the Illinois Department of Public Health (IDPH) conducted a surprise inspection of Greek American's suburban Chicago-based facility, as it does periodically for all long-term care facilities in the state, IDPH demanded Greek American demonstrate compliance instantaneously.

Regulators often assume non-compliance because they understand the challenges providers face supporting an evolving patient population and managing scheduling changes, as they strive to deliver quality care.

## Proving Staffing Levels Across the Facility

When IDPH regulators unexpectedly walked into Greek American Rehabilitation & Care Centre in January, they alleged noncompliance despite the facility's Five-Star Rating. The survey team demanded the front desk employee produce immediate proof of proper staffing.



### Greek American at a glance

Greek American Rehabilitation & Care Centre is a not-for-profit state-of-the-art facility located in the northwest suburbs of Chicago, Illinois, offering short-term rehabilitation and long-term nursing care, vacation/respite care, hospice and memory care, with love, respect, honor and dignity.

> " Long-term care is one of the most regulated industries in Illinois, second only to nuclear power plants. "

Mordechai Finkel,
Director of Human Resources,
Greek American Rehabilitation &
Care Centre



Using SmartLinx's workforce management suite, the employee immediately pulled up a "very powerful visual" that demonstrated proper staffing levels across the facility. The team was impressed but unconvinced.

Determined to dig deeper, regulators requested staffing levels and PPD census values for several random days.



> "Time is of the essence in these requests. Regulators want to ensure you're not creating the documents after the request. If they don't see something within 15 minutes, they assume you failed or can't prove compliance," Mr. Finkel said.

Greek American employees did not waiver as they used SmartLinx to generate reports that demonstrated compliance on each designated day.

> "We were able to produce proof very quickly without scrambling for attendance sheets or anything else. We showed the survey team images from the Nursing department's SmartLinx Master Schedule, and they wiped the complaint off their slate within 15 minutes," Mr. Finkel said.

## How SmartLinx streamlined Greek American's workforce to ensure compliance

About two years ago, Greek American implemented SmartLinx workforce management suite, including Schedule Optimizer, Time & Attendance, Payroll-Based Journal, Employee Self-Service mobile app and SMS/Texting. The integrated system streamlined labor processes in addition to helping ensure proper staffing despite fluctuating PPD census values and scheduling changes.

Within a few weeks, Greek American was leveraging the solution's real-time data to quickly identify and close scheduling gaps and minimize overtime.

> " SmartLinx makes our life a lot easier. For compliance alone, it's worth every penny even without the savings we see in labor costs every month. It's a game changer. "
>
> **Mordechai Finkel, Director of Human Resources, Greek American Rehabilitation & Care Centre**

# smartlinx

SmartLinx cares for those who care. Used in thousands of leading organizations, SmartLinx's workforce management solutions help healthcare providers manage people and processes by harnessing the power of real-time data. Solutions include talent acquisition and onboarding, human resources, benefits and payroll, time & attendance, scheduling, compliance, and business analytics. For more information visit smartlinx.com, or call 877-501-1310.



# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| SMARTLINX SOLUTIONS, LLC, | Civil Action No. 2:21-cv-711-BHH |
| Plaintiff, | |
| | **VERIFIED AMENDED COMPLAINT** |
| v. | **FOR TEMPORARY AND** |
| | **PERMANENT INJUNCTIVE AND** |
| VITZESLAV ZEIF, | **OTHER RELIEF** |
| Defendant. | |

Plaintiff SmartLinx Solutions, LLC ("SmartLinx" or "Plaintiff"), by way of this Amended Complaint against Vitzeslav Zeif ("Zeif"), alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is an action by SmartLinx for temporary, preliminary and permanent injunctive relief, as well as compensatory, consequential, punitive damages and legal fees associated with Zeif's misappropriation of SmartLinx's proprietary and confidential business information and trade secrets in order to unfairly compete against SmartLinx in the employee workforce management industry.

2.      Zeif's unlawful competitive efforts constitute violations of the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1839, *et seq.*); the Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1030(a)(4)); the South Carolina Trade Secrets Act ("SCTSA") (<u>S.C. Code</u> § 39-8-20, *et seq.*); and the common law of the State of South Carolina.

3.      SmartLinx will suffer irreparable harm in the event that Zeif is not immediately and permanently enjoined from the use and misappropriation of SmartLinx's confidential and proprietary business information and trade secrets.

ACTIVE/109099348.2

**THE PARTIES**

4. SmartLinx is a New Jersey limited liability company providing workforce management and scheduling solutions in the long-term care and nursing marketplace. SmartLinx conducts its principal management operations (including information technology and human resources) in Iselin, New Jersey.  SmartLinx provides workforce management and scheduling solutions throughout the United States, by developing software that companies use to oversee employee operations and to maximize efficiency in scheduling and staffing.

5. Zeif is the former Director of Product Management of SmartLinx, residing at 1420 Gemstone Blvd., Hanahan, South Carolina 29410.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction pursuant to 18 U.S.C. §§ 1030(g)) & 1836(c).

7. Venue is appropriate in this District, pursuant to 28 U.S.C. § 1391, because Zeif is domiciled in Hanahan, South Carolina.

8. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein arose in this District. Venue is also proper under 28 U.S.C. § 1391(c)(2) because Zeif is subject to the Court's personal jurisdiction with respect to the civil action in question.

9. This action arises under 15 U.S.C. §1051, *et seq*., and under common law.

**FACTS COMMON TO ALL COUNTS**

A. **Plaintiff SmartLinx**

10. For the past twenty (20) years, Plaintiff SmartLinx, has become a brand name as an innovator of workforce management solutions, from scheduling and time and attendance to

payroll and compliance in the post-acute and long-term care markets, including, but not limited to, nursing homes and assisted and independent living facilities.  SmartLinx has an established national presence through its scheduling application, which is well known and widely used in the market.

11.    SmartLinx distinguishes itself from other workforce management companies through its innovative scheduling products and software – Time and Attendance (TA) and Schedule Optimizer (SO), with the latest scheduling version including a feature called "Ideal Schedule."

12.    Over the last twenty (20) years, SmartLinx has expended millions of dollars in research, development and implementation of the scheduling software technology, including TA and SO.

13.    This scheduling technology is at the heart of Plaintiff's competitive edge in the marketplace, generating a significant part of Plaintiff's revenue.  More than half of SmartLinx's annual revenue is derived from this technology.

14.    This technology, and particularly the recently implemented and trademarked Ideal Schedule feature, was designed to support the unique regulatory and complex scheduling needs of the long-term care and nursing industry.  The technology provides SmartLinx a comprehensive plan of a facility's scheduling needs based on certain criteria, which is unrivaled in the industry and affords SmartLinx a competitive advantage over its competitors.

15.    The Affordable Care Act requires nursing facilities to electronically submit certain staffing information (including outside agency and internal contract staff) based on payroll and other data.  The data, when combined with census information, can then be used to

report on the level of staff in each nursing home, as well as employee turnover and tenure, which can impact the quality of care delivered.

16.     The Centers for Medicaid and Medicare ("CMS") has developed the Payroll Based Journal ("PBJ") which requires staffing information to be accurately collected on a regular and more frequent basis.

17.     The SmartLinx scheduling software allows a facility to properly track its staff hours and generate invoices, among other things, in compliance with CMS guidelines.

18.     The SmartLinx Ideal Schedule feature reviews the census level at a nursing facility and creates an ideal schedule to provide the most balanced and efficient staffing at the facility.   Specifically, the Ideal Schedule scans the SmartLinx comprehensive database for available nurses and recommends a list of internal and outside staff for the facility.  For example, the Ideal Schedule may recommend a more efficient and economical approach by scheduling staff from another facility rather than contacting a staffing agency.

19.     During the past year, SmartLinx has worked with other staffing agencies to roll out a new program that integrates the scheduling needs of nursing facilities with the supply of nurse staffing agencies through one interface provided by SmartLinx.  Zeif was directly involved in the development of this program.

**B.      Defendant Zeif's Hiring and Scope of Employment with SmartLinx**

19.     Zeif initially interned for SmartLinx after completing high school and was hired by SmartLinx in 2008 as Project Manager at the suggestion of his father, Alex Zeif, who is one of the founders of the Company.  Zeif's role with SmartLinx evolved over the past thirteen (13) years, from Service/Support to Product Management.  As a condition of his employment, Zeif was required to sign a series of agreements which required him to ensure and maintain security

precautions over the use of SmartLinx's confidential computer information, including its source code. Zeif was also prohibited from working for direct competitors following the conclusion of his employment, which is discussed more fully below.

20.    Throughout his employment with the Company, SmartLinx issued Zeif, among other things: (1) a Samsung Galaxy Note 9; (2) iPad; and (3) a Dell and Lenovo laptop ("SmartLinx Electronic Devices") for use in connection with his employment responsibilities.

21.    During his tenure, Zeif worked hand in hand with Plaintiff's development team in developing and enhancing SmartLinx's scheduling software application and had direct access to source code underlying the software.

22.    SmartLinx's source code is the unique and most fundamental component in the development of its scheduling software application—including the customization of software installations and development of critical features to the scheduling software application, including Ideal Schedule.  In other words, the source code is the "DNA" of SmartLinx's scheduling technology.

23.    SmartLinx's source code is not accessible to anyone outside of the company and, within the company, it is only accessible on a confidential and secured basis to those involved with its development.

24.    In early 2020, Zeif was promoted to the role of Director of Product Management, a senior level position, reporting directly to the Vice President of Product Management.

25.    Zeif's job responsibilities as Director of Product Management included:

a.    Driving SmartLinx technology, new products and offerings, pricing strategies, and technology roadmap to insure Plaintiff's competitive advantage in the market;

    b.  Working as the face of the SmartLinx platform for both internal and external stakeholders;

    c.  Managing both strategic and tactical activities for SmartLinx's technology;

    d.  High-level interaction with SmartLinx users including focus groups, one-on-one conversations, user groups, among other methods;

    e.  Management of all market and technical problems, requirements, and system requirements;

    f.  Organizing and leading user testing programs for SmartLinx technology, including internal alpha and external beta programs; and

    g.  Working closely with the Smartlinx corporate team to establish technology budgets, activities, and investments.

26.    In his role as Director of Product Management, Zeif had access to numerous high level and key company documents, data and databases, including the SmartLinx GitHub repository containing the highly confidential source code for its scheduling software.

27.    During his employment with SmartLinx, Zeif received generous salary and bonus compensation which increased over time, ultimately exceeding a total of $1,000,000 in salary and bonus.

**C.    The SmartLinx Agreements and Policies**

28.    Because Zeif would have substantial exposure to SmartLinx's Proprietary Information and management-level proprietary data, SmartLinx required—and Zeif agreed to— several agreements and policies that mandated him to protect the SmartLinx Proprietary Information.

29.    On April 10, 2009, Zeif signed and agreed to the terms of the SmartLinx Non-Competition Agreement. (See attached **Exhibit A**).

30.    In September 2009, Zeif was promoted to the position of Director of Support and Implementation.  (See attached **Exhibit K**).  Prior to the promotion, Zeif was a Project Manager at SmartLinx. (*See id.*)

31.    The SmartLinx Non-Competition Agreement states the following in pertinent part:

> **I will maintain appropriate personal and equipment security precautions in order to protect and maintain the confidential nature of all such materials. I specifically acknowledge the proprietary and confidential status of all customer lists customer data, requirements and development documentation, and source or object code supplied in the course of my job execution.**

32.    The SmartLinx Non-Competition Agreement also provides the following in relevant part:

> **I also commit that for a period of two (2) years beyond the conclusion of my work with SmartLinx Solutions, LLC, I will not be employed either as an employee, contractor or consultant with any entity that is directly competitive with SmartLinx Solutions, LLC.**

33.    Zeif also received and was subject to the terms and conditions of the policies and procedures contained in the SmartLinx Employee Handbook, including its Code of Conduct, Corrective Action and Personal Property & Workplace Searches policies.  (See attached **Exhibit B**).

34.    The Employee Handbook applies to all employees, including Zeif.  Among other things, under the Employee Handbook, the following behaviors are a breach of SmartLinx's Code of Conduct policy:

> **Employees are expected to exercise good judgment, good faith and loyalty to the Company in everyday performance. Each employee, alone, is responsible for his/her actions.**
>
> **Comply with all laws and regulations when conducting business on behalf of the Company.**
>
> **Exhibit respect toward co-workers, customers and /or vendors.**
>
> **Adhere to the terms of the SmartLinx Solutions, LLC "Non-Disclosure and Non-Compete Agreement" signed upon hire and maintained in their personnel file.**

35.     SmartLinx fully performed under all of the above applicable agreements and policies.

36.     The applicable agreements and policies were entered into by Zeif as a condition of his employment and for other valuable consideration.

37.     The applicable agreements and policies are fully enforceable.

**D.     Zeif's Sudden Resignation from SmartLinx**

38.     On February 12, 2021, Zeif surprised Jim Pirraglia, SmartLinx Vice President of Product, by informing Mr. Pirraglia that he was resigning from his employment with SmartLinx and would be willing to give the Company six weeks' notice of his departure.  At the time of that conversation, Zeif was evasive about his new employment situation.

39.     Thereafter, on February 14, 2021, Zeif spoke with Marina Aslanyan, SmartLinx Chief Executive Officer, and advised that he was resigning from the Company with the intent to go to work for a direct competitor of SmartLinx, Intelycare, Inc. ("Intelycare").

40.     Zeif stated that the job with Intelycare was an opportunity of a lifetime "too good to pass up" and that Intelycare wanted him "to come in and build a light version of a scheduling solution."  Indeed, Zeif was *admitting* that he would be joining a direct competitor of SmartLinx to help build up their competing scheduling application.

41.    On the same day, Zeif was reminded of his restrictive covenant obligations with SmartLinx.  Zeif denied that he had entered into any such agreement until he received an additional copy from the Company in the course of discussing his departure from SmartLinx.

42.    On information and belief, Intelycare is a Massachusetts company providing staffing and scheduling services to the healthcare industry, located at 1515 Hancock Street, #203, Quincy, Massachusetts 02169.

43.    According to its website, Intelycare is one of the fastest-growing companies in the country, has filled over three million shift hours, and is partnered with over 15,000 nursing professionals and 700 nursing facilities across the United States, and directly competes with SmartLinx for workforce management and scheduling to the healthcare industry.

44.    Intelycare directly competes with SmartLinx in the same space – the nursing and long-term care industry – and provides its own scheduling software that currently has less functionality than the SmartLinx software.

45.    On March 2, 2020, Intelycare announced the completion of their Series B funding round, totaling $45 million, with the goal to "disrupt nursing scheduling" through further development of its software solutions.  The referenced Forbes article is attached hereto as **Exhibit C**.  Zeif was aware of this funding during his interviews with Intelycare and its intended purpose to further develop software solutions in competition with those that he was intimately familiar with in his role at SmartLinx.

46.    According to the Forbes article referenced above, the "software allows nursing facilities to instantly request staff and for clinicians to take control of their schedule, potentially picking up shifts in less than 72 hours, which gives flexibility to nurses booking shifts.  An associated machine-learning algorithm also matches prices and people, and based on previous

behaviour, [Chris] Caulfield tells me that it can predict staffing-gaps before they happen, which appears to be solving problems at scale."

47.    The SmartLinx software and its Ideal Schedule feature, as discussed above, already provides a majority of these features and the new program being rolled out with staffing agencies, discussed above, will further improve and optimize the nursing scheduling industry.

48.    Intelycare's own actions also demonstrate that it actively competes with SmartLinx.  Intelycare's Google advertisements, as recent as October 2020, states the following:

> **"*Why Pay for SmartLinx? – 100% Free Scheduling Software*. Improve staff retention with mobile-friendly, transparent, and flexible scheduling options. Try our easy-to-use scheduling platform 100% free of charge. Keep your nurses smiling. 100% Free Software. Cut Agency Spend by 50%."**

> **"*Ditch Smartlinx. – 100% Free Scheduling Software* – IntelyCare.com. Improve staff retention with mobile-friendly, transparent, and flexible scheduling options. Happier staff means better patient outcomes. Give us 30 minutes and we'll give you $50. Minimal setup. Reduce Nurse Burnout. Cut Agency Spend by 50% 100% Free Software."**

49.    The above advertisements confirm that Intelycare regards SmartLinx as a competitive threat in the nursing and long-term care industry with the explicit intent to drive SmartLinx out of the market.

**E.    Zeif's Theft of SmartLinx's Confidential and Proprietary Source Code**

50.    In connection with resignation from SmartLinx to work for its direct and critical competitor, Intelycare, Zeif engaged in a systematic and strategic raid of Plaintiff's most confidential business plans and proprietary information, in violation of the confidentiality provisions of the SmartLinx Non-Disclosure and Non-Compete Agreement (the "SmartLinx Non-Competition Agreement") that he signed, as well as in violation of the DTSA, the CFAA, and the SCTSA.

51.    By hiring Zeif, Intelycare will have access to SmartLinx's confidential and proprietary information, including its scheduling software source code, that will aid the development of its competing scheduling software to "disrupt nursing scheduling" to the detriment of SmartLinx and its competitive advantage in this space.

52.    SmartLinx first learned of Zeif's unauthorized activities by performing a forensic audit of its systems and information after Zeif advised of his intention to join Intelycare.  The results of the audit, which are still in progress, revealed alarming information.

53.    As early as April 2020, Zeif breached the confidentiality provisions of his SmartLinx Non-Competition Agreement by surreptitiously installing software to download the SmartLinx scheduling software source code (the "SmartLinx Proprietary Information") to his own computer.  Specifically, Zeif accessed the SmartLinx GitHub repository to download approximately fifty thousand (50,000) files containing SmartLinx Proprietary Information onto his OneDrive cloud system and his computer's local C Drive.

54.    Zeif had no authorization or permission from SmartLinx to engage in this nefarious activity and none of the other SmartLinx developers engaged in the same or similar behavior.    Moreover, SmartLinx developers responsible for working on the SmartLinx Proprietary Information *always* accessed the source code directly through the GitHub repository without ever downloading these files to the OneDrive or a local C Drive.

55.    Indeed, after being promoted to Director of Product Management in early 2020, Zeif was no longer responsible for coding and thus had no reason to work on SmartLinx Proprietary Information.

56.    In fact, SmartLinx expressly instructed Zeif to discontinue working on the source code.  Jim Pirraglia (SmartLinx Vice President of Product and Zeif's direct supervisor) and

Marina Aslanyan (SmartLinx Chief Executive Officer) had numerous conversations with Zeif from October 2020 through and including February 2021 where they expressly instructed him not to work on the source code to ensure accountability of the development team. He responded that he understood during those conversations and confirmed that he was. *no longer working on the source code.*

57.    In January 2021, *after* he began the interview process with Intelycare and less than a month prior to his resignation, Zeif again performed a mass download of computer files containing the SmartLinx Proprietary Information from the GitHub repository to his OneDrive and Local C drive without the permission of SmartLinx.

58.    Zeif's illegal conduct of downloading SmartLinx Proprietary information to his OneDrive and Local C drive continued and he downloaded files on the *same days* he gave verbal and written notice of his resignation, February 14, 2021 and February 24, 2021, respectively.

59.    The majority of the file downloads occurred during non-working hours on weekends and *after* Zeif gave notice of his resignation. A summary of the detail showing a sampling of the files is attached hereto as **Exhibit D**.

60.    Although Zeif later suggested through counsel that he had downloaded the files for work purposes to correct or fix software "bugs," the forensic audit of his work laptop computer revealed that the downloaded files were not actually being modified by him at all but rather were being locally stored on Zeif's hard drive where only he could later access them. Moreover, a comparison of Zeif and other employees that accessed the GitHub Repository during this time revealed that *no other* employee downloaded or copied the SmartLinx Proprietary Information in the same or similar manner.

61.    During this time, Zeif also used his SmartLinx issued work phone to communicate with Intelycare and to schedule his Zoom interviews with representatives of his prospective employer.

62.    The calendar entries obtained from Zeif's work phone reflect that from January 20, 2021 through February 8, 2021—the very time period during which Zeif was downloading Smartlinx Proprietary Information—Zeif engaged in multiple Zoom calls with varying levels of Intelycare senior management, including two meetings between Zeif and the Intelycare CEO. A summary of Zeif's calendar entries showing scheduled Zoom meetings with Intelycare is attached hereto as **Exhibit E**.

63.    The process of interviewing Zeif for a position with Intelycare (which one of the Zoom meetings indicates is for a Product Director position) occurred over short, sixteen (16) day period from January 20 to February 5, 2020, after which he was presented with an offer, with a follow up meeting on February 8th.

64.    Upon information and belief, Zeif received equity as part of the offer to join Intelycare.

65.    On February 8, 2021, Zeif texted a fellow SmartLinx employee, boasting about his decision to leave SmartLinx: "I'm gonna give them 6 weeks notice and **moonlighting** after."

66.    It follows that after providing notice to SmartLinx, Zeif had every intention to act as a faithless servant against the interests of SmartLinx, which is precisely what occurred in mid to late-February 2021 when Zeif accessed the GitHub repository to download tens of thousands of files containing the SmartLinx Proprietary Information to his local devices.

67.    Indeed, an audit of the internet searches performed by Zeif after giving notice of his resignation revealed two key indicators of his intentions to misappropriate SmartLinx source

code. First, Zeif reviewed a software article entitled "Who Owns the Code?" which explains the issues associated with efforts of source code programmers to **reuse** code they had developed after moving to a new employer. Second, Zeif conducted a search to determine how to create remote work access for a separate (non-SmartLinx) computer, enabling him to log into that computer and remotely access SmartLinx systems. A true and accurate copy of these links from Zeif's Google Chrome browser and the software article is attached hereto as **Exhibit F**.

68.    Additionally, an audit of Zeif's SmartLinx devices shows that on February 13, 2021, after downloading files containing SmartLinx Proprietary Information onto his OneDrive cloud system and local C Drive, he used a series of external USB devices—used to store and transfer data from one device to another (i.e., computer to computer transfer of files)—to connect to his devices, which were not disclosed or returned to SmartLinx when his employment ended. The audit also revealed that Zeif has access to a series of external devices and platforms in addition to USB devices, including a Google Gmail address, additional phones, computers, and a Dropbox and Google Drive account linked to his SmartLinx Devices.

69.    It is the purpose of this action to enjoin Zeif's continued use and possession of SmartLinx's valuable Proprietary Information.

70.    At the time of the filing of the Verified Complaint, Zeif represented that he had not yet commenced employment with Intelycare but that he intended to do so by March 15, 2021. To SmartLinx's knowledge, as of the date of this filing, Zeif has not yet commenced employment with Intelycare.

71.    It is further the purpose of this action to enjoin Zeif from accepting and engaging in employment with Intelycare, a direct competitor to Plaintiff.

72.    While SmartLinx's investigation is ongoing, the information already known to have been misappropriated to date comprises valuable trade secrets belonging to SmartLinx and reflects the targeted and deliberate tactics of Zeif to take the most valuable data of SmartLinx, including the source code behind its proprietary scheduling software application.

73.    The main function of the SmartLinx Proprietary Information taken by Zeif is to develop SmartLinx's proprietary scheduling software application.  Zeif's misappropriation of this SmartLinx Proprietary Information allows him to use and recreate SmartLinx's highly valuable scheduling software application and features.

74.    Zeif's theft of the SmartLinx Proprietary Information will allow a competitor, like Intelycare, to recreate SmartLinx's scheduling software application which will cause irreparable harm and significant damage SmartLinx's position in the marketplace and longstanding customer relationships.

**F.    SmartLinx Safeguards and Protects its Trade Secrets and Proprietary Information**

75.    In its operations, SmartLinx produces and maintains trade secrets and confidential information that have independent economic value.  SmartLinx has taken and continues to take appropriate steps to maintain the confidentiality of its trade secrets and confidential information, including the following:

(a)    The source code is maintained in the SmartLinx GitHub repository that only employees in SmartLinx's Information Technology department with an authorized UserID and Password can access in its native electronic form. Zeif was given user access as he was a senior-level employee of the Company and had such access removed at the time of his termination in keeping with the procedures utilized by SmartLinx.

(b)    SmartLinx requires all employees to sign multiple agreements equivalent to that signed by Zeif, including the SmartLinx Non-Competition Agreement.

(c)    Access to the subject information taken by Zeif is restricted within SmartLinx to persons of appropriate level of employment and with reason to access such information, provided such persons have executed appropriate confidentiality and non-disclosure agreements.  They are not publicly known or disclosed outside of SmartLinx.

**G.    SmartLinx Terminates Zeif For Cause And Notifies His Prospective Employer Intelycare**

76.    On February 28, 2021, SmartLinx transmitted correspondence to Zeif, terminating him for cause and directing him to immediately discontinue utilizing all electronic devices provided to him by SmartLinx during the course of his employment ("Cease and Desist Directive").  A true and correct copy of the February 28, 2021 Letter is attached hereto as **Exhibit G**.

77.    Also on February 28, 2021, SmartLinx transmitted correspondence to Intelycare, advising the company of Zeif's illegal conduct and demanding that Intelycare cease and desist all efforts to employ Zeif.

78.    SmartLinx also requested that Intelycare: (1) provide SmartLinx with a list of any and all of the Company's proprietary information, including, but not limited to, electronic and hardcopy information, computer files, source codes, and software that were provided to Intelycare by Zeif, and request that; (2) Intelycare return all SmartLinx Proprietary Information in its possession.  A true and correct copy of the February 28, 2021 Letter to Intelycare is attached hereto as **Exhibit H**.

79.     SmartLinx has learned as a result of its ongoing review of Zeif's actions in and around the time of his termination on February 28, 2021, that Zeif defied SmartLinx's Cease and Desist Directive issued to him on the same day to discontinue accessing any of his electronic devices and continued to use the machine to access source code development software and his Google Drive.   *See* attached hereto as **Exhibit J**, the Declaration of forensic expert Tino Kyprianou ("Kyprianou Decl.").

80.     In fact, the log entries indicate that he continued accessing the laptop for more than six hours after SmartLinx directed him verbally and in writing to stop working on the machine.   There is no justification for Zeif's actions with respect to SmartLinx's electronic devices following termination of employment and SmartLinx's Cease and Desist Directive.   *Id.*

81.     On March 1, 2021, SmartLinx received correspondence from John E. North, Jr., Esq. ("North"), counsel for Zeif.  A true and correct copy of the March 1, 2021 Letter from North is attached hereto as **Exhibit I**.

82.     In his correspondence, Zeif denies misappropriating SmartLinx Proprietary Information claiming that spent a significant amount of time rectifying software "bugs" brought to his attention by SmartLinx or its customers.

83.     Further, Zeif claims that he did this work for years, primarily on weekends so as not to interfere with his primary responsibilities, for the purpose of assisting his team.

84.     Indeed, Zeif admits in the North letter that this type of activity was **not part his job description** as Director of Product Management.  Moreover, in 2020, Zeif had no reason to work on the SmartLinx source code because that activity was designated to the development team.

85.     A forensic audit of the SmartLinx devices obtained from Zeif after his termination directly contradicts the statement in the North Letter that he regularly worked weekends to fix this bug problem.  Indeed, the data on the devices reveals that the bulk of this activity—downloading SmartLinx Proprietary Information from the GitHub repository to Zeif's local devices—occurred on three occasions: in April 2020, November 2020, with the majority of the activity in January and February 2021, after Zeif began to interview with Intelycare.  *See* **Exhibit J**, Kyprianou Decl.

86.     The forensic audit of Zeif's devices also contradicts the statements in the North Letter that Zeif would delete the source code files from his local devices after allegedly fixing the bug problem because thousands of source code files remain on the system.  Zeif neither modified the source code nor deleted it from his local devices.  Nevertheless, SmartLinx policies and procedures prohibited any such deletion of files and information from SmartLinx devices.

87.     Zeif's misappropriation of the SmartLinx Proprietary Information was intentional, knowing, willful and malicious.

88.     Unless the Court intervenes to protect SmartLinx's Proprietary Information and to enforce the SmartLinx Non-Competition Agreement and expressly enjoins Zeif from further possession or use of such information, SmartLinx will be immediately and irreparably harmed.

89.     SmartLinx has spent hundreds of thousands of dollars in expense, person-hours, trial-and-error, and overhead dedicated to creating and maintaining the aforementioned trade secrets and confidential information.  To allow Zeif to continue his unlawful possession and use of the misappropriated confidential and proprietary information and trade secrets of SmartLinx would allow him reduce or limit SmartLinx's competitive edge

through illegal activities when it would otherwise take Zeif many years and millions of dollars for the time, labor and expense to develop and achieve its own equivalent implementation of SmartLinx's business practices.

## COUNT ONE
### Trade Secret Misappropriation Under the Federal Defend Trade Secrets Act, (18 U.S.C. § 1839, *et seq.*)

90.     SmartLinx repeats and realleges each and every allegation contained in the prior paragraphs of this Verified Amended Complaint as if fully set forth at length herein.

91.     The SmartLinx Proprietary Information contain confidential and trade secret documents and information.

92.     The SmartLinx Proprietary Information relate to services used in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

93.     SmartLinx has taken reasonable steps to protect the secrecy of the SmartLinx Proprietary Information, including the secrecy of the SmartLinx Proprietary Information that Zeif has misappropriated.

94.     Zeif has misappropriated the SmartLinx Proprietary Information in the improper and unlawful manner as alleged herein.

95.     Zeif's misappropriation of the SmartLinx Proprietary Information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

96.     As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

**WHEREFORE**, Plaintiff seeks entry of judgment against Defendant Zeif pursuant to the Prayer for Relief set forth below.

## COUNT TWO
### Computer Fraud and Abuse Act

**(18 U.S.C. § 1030)**

97.    SmartLinx repeats and realleges each and every allegation contained in the prior paragraphs of this Verified Amended Complaint as if fully set forth at length herein.

98.    As alleged above, both prior to and after his termination, Zeif intentionally accessed the computer systems of SmartLinx to copy proprietary and confidential information and trade secrets in direct violation of the terms and conditions of his employment and company policy.  The access of the system by Zeif was completely unauthorized for the purpose in which he accessed the system.

99.    Zeif obtained such information from SmartLinx's protected cloud-based server system, which is connected to the Internet and is used in interstate and foreign commerce, without authorization and obtained information therefrom, in violation of 18 U.S.C. § 1030(a)(2)(C).

100.    Zeif accessed SmartLinx's computer systems with the intent to steal, deprive, and defraud SmartLinx of its computer data and records and to use those data and records for improper purposes on behalf of himself and Intelycare, to the detriment of SmartLinx.

101.    Zeif was not authorized to access the computer or database for the purpose of copying the information from the computer system, including for purposes inimical and injurious to SmartLinx and its interests following his resignation from employment.

102.    By means of this conduct, Zeif knowingly and intentionally obtained valuable proprietary and confidential information and trade secrets from SmartLinx's computer system and furthered the scheme and conspiracy with Intelycare.

103.    In taking the above actions, Zeif has damaged SmartLinx in that, among other things, Zeif has caused competitive harm to SmartLinx, and has caused SmartLinx to expend

resources to investigate the unauthorized access and to prevent such access from continuing. The losses caused by Zeif as a result exceed $5,000 within a period of one year in violation of the law including, but not limited to, 18 U.S.C. § 1030(c)(4)(A)(i)(I).

104.    As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

**WHEREFORE**, Plaintiff seeks entry of judgment against Defendant Zeif pursuant to the Prayer for Relief set forth below.

<u>COUNT THREE</u>
**Trade Secret Misappropriation Under the South Carolina Trade Secrets Act**
**(S.C. Code § 39-8-20, *et seq.*)**

109.    SmartLinx repeats and realleges each and every allegation contained in the prior paragraphs of this Verified Amended Complaint as if fully set forth at length herein.

110.    The SmartLinx Proprietary Information contain confidential and trade secret documents and information.

111.    SmartLinx has taken reasonable steps to protect the secrecy of the Proprietary Information, including the secrecy of the SmartLinx Proprietary Information that Zeif has misappropriated.

112.    Zeif has misappropriated the SmartLinx Proprietary Information by acquiring same, knowing and/or having reason to know that the trade secrets were acquired by improper means, including by the breach of an express and/or implied duty to maintain the secrecy of, and/or to limit the use or disclosure of, the trade secrets.

113.    Zeif has failed to return to SmartLinx its Proprietary Information and has attempted to conceal his theft of such information.

114.    Upon information and belief, Zeif's misappropriation of the SmartLinx Proprietary Information was intentional, knowing, willful, malicious, fraudulent, and oppressive. As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

## COUNT FIVE
### Breach of Contract

115.    SmartLinx repeats and realleges the allegations contained in the prior paragraphs of this Verified Amended Complaint as fully set forth at length herein.

116.    On April 10, 2009, in exchange for continued employment and other valuable consideration, Zeif entered into the SmartLinx Non-Competition Agreement which prohibited Zeif from:

a.    Copying, removing, or downloading SmartLinx Proprietary information from its systems;

b.    Disclosing SmartLinx Proprietary Information to anyone outside SmartLinx, during and after his employment with SmartLinx; and

b.    Working for a competitor of SmartLinx for two (2) years after the termination of his employment with SmartLinx.

117.    Zeif breached the SmartLinx Non-Competition Agreement by:

a.    Surreptitiously copying and downloading the SmartLinx Proprietary Information out of the SmartLinx GitHub repository and onto his OneDrive and Local C Drive;

b.    Upon information and belief, disclosing SmartLinx Proprietary Information, including information concerning the SmartLinx scheduling software and source code, to SmartLinx's competitor, Intelycare.

c.    Accepting an offer to commence employment with Intelycare.

118.    As a direct and proximate result of Zeif's breach of the SmartLinx Non-Competition Agreement, SmartLinx has been and will continue to be damaged in an amount to be determined at trial.

## COUNT SIX
### Misappropriation

119.    SmartLinx repeats and realleges the allegations contained in the prior paragraphs of this Verified Amended Complaint as fully set forth at length herein.

120.    Zeif's conduct, as set forth herein, constitutes misappropriation of SmartLinx's trade secrets, being comprised of and set forth in the SmartLinx Proprietary Information.

121.    As a result of Zeif's acts of misappropriation, SmartLinx has been injured.

122.    SmartLinx has suffered and will continue to suffer irreparable harm as a result of Defendant's activities, and SmartLinx has no adequate remedy at law.

123.    As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

**WHEREFORE**, Plaintiff seeks entry of judgment against Defendant Zeif pursuant to the Prayer for Relief set forth below.

## COUNT SEVEN
### Conversion

124.    SmartLinx repeats and realleges the allegations contained in the prior paragraphs of this Verified Amended Complaint as fully set forth at length herein.

125.    Zeif's conduct, as set forth herein, constitutes conversion of SmartLinx's trade secrets, being comprised of and as set forth in the SmartLinx Proprietary Information.

126.    As a result of the Zeif's acts of conversion, SmartLinx has been injured.

127.    SmartLinx has suffered and will continue to suffer irreparable harm as a result of Defendant's activities, and SmartLinx has no adequate remedy at law.

128.    As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

**WHEREFORE**, Plaintiff seeks entry of judgment against Defendant Zeif pursuant to the Prayer for Relief set forth below.

<u>COUNT EIGHT</u>
**Breach of Fiduciary Duty and Duty of Loyalty**

129.    SmartLinx repeats and realleges each and every allegation contained in the prior paragraphs of this Verified Amended Complaint as if fully set forth at length herein.

130.    As a director of SmartLinx, Zeif owed SmartLinx a duty of loyalty and was obligated to act with the utmost good faith, and in the best interest of SmartLinx.

131.    SmartLinx was entitled to place its trust and confidence in Zeif, and was entitled to expect him to act with the utmost good faith toward it in carrying out the employment and business of SmartLinx.

132.    SmartLinx relied on the loyalty and integrity of Zeif and his faithful performance of his responsibilities.

133.    Zeif took advantage of SmartLinx's faith in him – thereby breaching his fiduciary duties – by failing to perform his duties to SmartLinx, by acting in conflict of interest, by engaging in activities for his own benefit and to the detriment of SmartLinx, and, upon information and belief, by providing the SmartLinx Proprietary Information to Intelycare.

134.    Zeif knowingly and willingly breached his duty of loyalty to SmartLinx by misappropriating SmartLinx's Proprietary Information, and engaging in acts that undermined SmartLinx's business operations.

135.    Zeif acted in a manner inconsistent with his agency and trust by misappropriating SmartLinx's Proprietary Information to the injury of SmartLinx and for his own benefit, and by acting against SmartLinx's interests while and after being employed by SmartLinx.

136.    As a direct and proximate cause of the disloyalty Zeif and breach of his duties, SmartLinx has been and is being harmed, and faces risk of irreparable harm.

137.    Zeif is still possession of the SmartLinx Proprietary Information, is able to access it, and is able to use this information to benefit other parties and to the detriment of SmartLinx.

138.    As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

**WHEREFORE**, Plaintiff seeks entry of judgment against Zeif pursuant to the Prayer for Relief set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, SmartLinx demands judgment against Zeif on all Counts of the Verified Amended Complaint that includes the entry of an Order:

A.    Temporarily, preliminary and permanently enjoining and restraining Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, (and requiring the Zeif to not permit any parties acting on his behalf) from any implementation, modification or customization of its business practices or operations, including without limitation its source code software based upon the SmartLinx Proprietary Information, or any other trade secrets or internal, proprietary, or confidential documents, data, or information of SmartLinx;

B.    Temporarily, preliminary and permanently enjoining and restraining Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, (and requiring Zeif to not permit any parties acting on his behalf) from the disclosure or use of the SmartLinx Proprietary Information or any other

trade secrets or internal, proprietary, or confidential documents, data, or information of SmartLinx;

C.      Temporarily, preliminary and permanently enjoining and restraining Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, (and requiring Zeif to not permit any parties acting on his behalf) from reproducing or otherwise using the SmartLinx Proprietary Information, and any and all internal, confidential, proprietary, and/or trade secret documents, data, and/or information belonging to SmartLinx;

D.      Temporarily, preliminary and permanently enjoining and restraining Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, (and requiring Zeif to not permit any parties acting on his behalf) from viewing the SmartLinx Proprietary Information  or any other trade secrets or internal, proprietary, or confidential documents, data, or information of SmartLinx, in his possession which has not yet been viewed by Zeif or any persons acting on his behalf;

E.      Requiring Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, to immediately return all records related to SmartLinx in their possession including the SmartLinx Proprietary Information , all trade secrets or internal, confidential, or Proprietary Information , data, or information belonging to SmartLinx, and any copies thereof, to SmartLinx, including but not limited to, documents, e-mails, customer lists, spreadsheets, computer files, financial information and all other information concerning SmartLinx;

F.      Requiring that Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, immediately disclose to SmartLinx each person, including individuals and business entities, with whom they have shared SmartLinx trade secrets or internal, confidential, or Proprietary Information , data, or information (electronic or otherwise), including any and all documents, data, or information in their possession, custody or control;

G.      Directing Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, to preserve Zeif's business and personal computers and electronic storage devices to determine the extent of information and company property that was copied from the computer network(s) of SmartLinx, and, to that end, order Zeif to (i) refrain from taking any action to destroy, discard, tamper with, or delete any electronic or written

ACTIVE/109099348.2

communications, documents, materials, and any and all information in Zeif's possession, custody or control relating to the SmartLinx Proprietary Information , all trade secrets or internal, confidential, or Proprietary Information , data, or information belonging to SmartLinx, and any copies thereof;  (ii) take all steps necessary to ensure preservation of all communications in connection with the SmartLinx Proprietary Information , all trade secrets or internal, confidential, or Proprietary Information , data, or information belonging to SmartLinx, and any copies thereof, including all electronically formatted or stored documents in Zeif's possession, custody, or control, and (iii) adjust any document retention or destruction policy and all computer backup protocols to ensure the preservation of the SmartLinx Proprietary Information , all trade secrets or internal, confidential, or Proprietary Information , data, or information belonging to SmartLinx, and any copies thereof.

H.    Directing Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, to allow SmartLinx, or its agent, access to Zeif's business and personal computers and electronic storage devices to determine the extent of information and company property that was copied from the computer network(s) of SmartLinx and/or including or related to the SmartLinx Proprietary Information.  SmartLinx will also have the right to copy any such devices at Zeif's expense;

I.    The appointment of a Special Monitor paid for by Zeif to ensure that no proprietary or confidential information of SmartLinx is used by Defendant in future;

J.    Awarding compensatory, consequential and punitive damages arising out of Zeif's conduct given that their conduct was intentional, knowing, willful, malicious, fraudulent, and oppressive;

K.    Awarding costs and counsel fees incurred in this action as required;

L.    Ordering expedited discovery; and

M.    Granting such other and further relief as this Court deems equitable and just.

Respectfully submitted,

s/  Jennifer K. Dunlap
Jennifer K. Dunlap, Esq. (SC Bar # 76031)
Email: jennidunlap@parkerpoe.com
PARKER POE ADAMS & BERNSTEIN LLP
200 Meeting Street, Suite 301
Charleston, South Carolina 29401
Phone:  843-727-2650
Fax:  843-727-2680

Howard A. Matalon, Esq.*
Alex Umanksy, Esq.*
OlenderFeldman LLP
422 Morris Avenue
Summit, New Jersey 07901

*Motion for *Pro Hac Vice* Admission to be filed

ATTORNEYS  FOR  PLAINTIFF  SMARTLINX
SOLUTIONS, LLC

Dated:   April 5, 2021
Charleston, South Carolina

## VERIFICATION

Marina Aslanyan, Chief Executive Officer of Plaintiff, SmartLinx Solutions, LLC, verifies under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements contained in the foregoing Verified Amended Complaint are true and correct to the best of my knowledge, information and belief.

_____

Marina Aslanyan, CEO
SmartLinx Solutions, LLC

Dated:  April 5, 2021



# EXHIBIT E

VISION    PRODUCTS ▾    SOLUTIONS ▾    SERVICES ▾    RESOURCES    COMPANY ▾

## Manage costs by enforcing pay policies

Prevent time theft, buddy punching, and excessive overtime. Only allow punches at the right time and location, thanks to our flexible rule engine. And ensure accountability and accuracy with touchless or fingerprint-enabled time clocks, built in the U.S.

NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

VISION    PRODUCTS ▾

338.1657724231994.1657730346215.4&__HSSC=113157595.610563.1657721020296&__HSFP=3798481312) (https://www.smartlinx.com/)

CONTACT US (HTTPS://WWW.SMARTLINX.COM/CONTACT-US/)

SOLUTIONS ▾    SERVICES ▾    RESOURCES    COMPANY ▾

HTML)

≡

(https://www.smartlinx.com/)    VISION    PRODUCTS ▾

TIME & ATTENDANCE

# Spend less time tracking time

SOLUTIONS ▾    SERVICES ▾    RESOURCES    COMPANY ▾



NOT AN OFFICIAL COPY

**smartlinx** (https://www.smartlinx.com/) 



VISION

PRODUCTS ▾

SOLUTIONS ▾    SERVICES ▾    RESOURCES    COMPANY ▾

# Time & Attendance

What if you could see your entire staff's attendance at a glance? SmartLinx makes it easy to instantly monitor your employees' time, enforce pay policies, and analyze trends to make better decisions.

COMPREHENSIVE

OVERSIGHT

# Track, review, and edit

NOT AN OFFICIAL COPY

(https://www.smartlinx.com/)

VISION   PRODUCTS ▾



SOLUTIONS ▾   SERVICES ▾   RESOURCES ▾   COMPANY ▾

in real time

Get an up-to-the-minute view of every punch in, punch out, absence, and overtime for all employees. Empower employees to correct their own punches and approve those requests with a click.

EASY ENFORCEMENT

# Manage costs by enforcing pay policies

Prevent time theft, buddy punching, and excessive overtime. Only allow punches at



the right location and location, thanks to our flexible rule engine. And ensure accountability and accuracy with touchless or fingerprint-enabled [time clocks (https://www.smartlinx.com/products/time-clocks/)](https://www.smartlinx.com/products/time-clocks/), built in the U.S.

INTELLIGENT INSIGHTS

# Make informed decisions

Analyze performance against schedule, receive proactive alerts about overtime, and elevate your workforce planning with insights on employee turnover, hours, and number of manual corrections.



NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

VISION          PRODUCTS ▾

SOLUTIONS ▾          SERVICES ▾          RESOURCES          COMPANY ▾

# Get everything working better together

Our Time and Attendance product integrates directly with Schedule Optimizer (https://www.smartlinx.com/products/schedule-optimizer/), Payroll (https://www.smartlinx.com/solutions/payroll) and our intelligent time clocks (https://www.smartlinx.com/products/time-clocks/). It's one complete system for ensuring total accuracy, automatically.





smartlinx (https://www.smartlinx.com/)

VISION   PRODUCTS ▾

SOLUTIONS ▾   SERVICES   RESOURCES   COMPANY ▾

**Monitor and control overtime**

**Perform real-time queries**

**Track exceptions & absences**

**Easily edit or correct timecards**

**Automatically process differentials**

**Prohibit non compliant punch-ins**

"We were looking for a system for both Time &

NOT AN OFFICIAL COPY

smartlinx (https://www.smartlinx.com/)

Attendance and Scheduling, and SmartLinx was the only full-featured system with the management capabiltiies, flexibility, tech support, and maintenance plan that met our requirements. Without doubt the system has paid for itself already."

**Monica Bustamante**
CIO, Moravian Hall Square

See what success with SmartLinx looks like

VIEW SUCCESS S

(HTTPS://RESOURCES.SMART

STORIES

smartlinx (https://www.smartlinx.com/)

VISION        PRODUCTS ▾

SOLUTIONS ▾        SERVICES ▾        RESOURCES        COMPANY ▾

smartlinx (https://www.smartlinx.com/)

VISION     PRODUCTS ▾

SOLUTIONS ▾     SERVICES ▾     RESOURCES     COMPANY ▾

# Let's get smarter about Time and Attendance

SCHEDULE A DEMO (HTTP://PAGES...

HSTC=113157595.0D4BF4213672AB54A7B8B73CF98012B1.1656070652338.16...

**PRODUCTS**

Employee Scheduling (https://www.smartlinx.com/products/staff-go/)

Time & Attendance (https://www.smartlinx.com/products/time-and-attendance/)

Workforce Analytics (https://www.smartlinx.com/products/business-analytics/)

Mobile Shift Management (https://www.smartlinx.com/products/smartlinx-go/)

Payroll Based Journal Report (https://www.smartlinx.com/products/aca-director/)

Kronos Alternative Workforce Management (https://www.smartlinx.com/products/business-alternative-workforce-management-software/)

**SERVICES**

Deployment (https://www.smartlinx.com/services/deployment/)

Training (https://www.smartlinx.com/training/)

Customer Support (https://www.smartlinx.com/customer-support/)

Kronos Alternative Workforce Optimization (https://www.smartlinx.com/kronos-...

**COMPANY**

Overview (https://www.smartlinx.com/company/)

Leadership Team (https://www.smartlinx.com/company/leadership-team/)

News (https://www.smartlinx.com/news/)

Contact (https://www.smartlinx.com/contact/)

(https://www.sm...

877-501-...

Subscribe to Our Newsletter

smartlinx (https://www.smartlinx.com/)

First Name *

Last Name *

Email *

SOLUTIONS ▾

SUBMIT

VISION

PRODUCTS ▾

SERVICES ▾

RESOURCES

COMPANY ▾

Human Resources (https://www.smartlinx.com/products/human-resources/)

Applicant Tracker (https://www.smartlinx.com/products/applicant-tracker/)

Careers (https://www.smartlinx.com/)

Support (https://www.smartlinx.com/)

Payroll (https://www.smartlinx.com/products/payroll/)

Benefits Administration (https://www.smartlinx.com/products/benefits-administration/)

Human Capital Analytics (https://www.smartlinx.com/products/business-analytics/)

© 2022 SmartLinx Solutions. All Rights Reserved | Privacy Policy (https://www.smartlinx.com/privacy-policy) | Terms & Conditions (https://www.smartlinx.com/terms-and-conditions)

Sitemap (https://www.smartlinx.com/sitemap/)

(https://www.linkedin.com/company/smartlinx-solutions/)



# EXHIBIT F



# Senior care solutions: Iselin-based company is using AI to help address 'pain points' in elder care industry

**Focus On ...**

By **Brett Johnson** (Iselin) · June 1, 2021



Anil Chillarige, chief technology officer of SmartLinx. - *SmartLinx*

Gaps in the resources available at senior care facilities appeared wide as canyons when the spread of COVID-19 made itself known in these centers.

And, where there weren't enough humans, artificial intelligence showed potential to patch holes.

Although the ballooning of the world's aging population set off discussion starting several years back — headlines touted a coming "revolution" in that industry — regarding AI's role in care for the elderly, three-decade tech sector veteran Anil Chillarige said it's only now starting to materialize.

"This technology just had not been applied to the senior care space to the extent it could be," he said.

Chillarige is chief technology officer of a company involved in the industry's more AI-friendly transformation. He's helping guide SmartLinx, an Iselin-based leader in cloud workforce management solutions for senior care providers.

It's advanced algorithms and machine learning technologies that Chillarige hopes will address some of what he calls long-existing "pain points" in the senior care business — or challenges for those staffing facilities and those receiving the care that got a whole lot more painful during the pandemic.

"The people giving care spend a lot of time doing it, and, in the process, they forget to take care of themselves," he said. "They can be really stressed. So, some of the things we're doing is gathering information with tech solutions to analyze how individuals are performing duties. … We can, for example, provide them intelligent suggestions on when to take breaks."

Chillarige compared it to other consumer-oriented smart devices, including newly manufactured cars that can recognize the pattern of a drowsy driver and send a message to them recommending they take a break.

"The indications also help seniors who are given the care," he said. "People who are giving care can be attentive and fresh. That way, they don't make mistakes out of tiredness or the amount of time they're spending working."

The Iselin company started bringing together researchers, developers and their partners to advance its tech-laden approach at a lab it established last month. It's in Charleston, South Carolina, where the company manufactures its product hardware.

Part of that initiative involves working on an AI-driven staffing tool that will serve as a matchmaker between available senior care staff and the facilities nearest them. The digital marketplace they're creating in tandem with staffing companies will allow qualified individuals to move from one facility to another based on the needs of those facilities.

"It's almost like we're developing the Uber of the senior care space," he said. "But that model in this space is really a win-win for everyone."

At more than one in five nursing homes, there were severe shortages of staff and of personal protective equipment, according to a report in August from the medical journal Health Affairs.

While another Health Affairs report indicated that staffing levels did not "significantly" change during the pandemic, there was still a perception that the amount of existing staff at these facilities was not adequate for last year's COVID-19 case surges.

"The pandemic really brought this issue to its peak level," he said. "The problems for a facility were always this: staffing, staffing, staffing. Will you be able to find skilled people at a given time in a given location when you need them? That was the million-dollar question."

In bridging some of the gaps in the support for the elderly, SmartLinx is working on utilizing "intelligent agents," with something like Apple's Siri being a close correlate. These all-AI agents can exhibit artificial emotional intelligence in their interactions with senior care residents.

Not all of what a company like SmartLinx is doing with algorithms sounds as science-fiction ready as robots chatting with the elderly, but when it comes to something like controlling the affordability of senior care facilities, there's perhaps nothing more important.

Chillarige said the company is hoping to drive down costs by automatically creating senior care cost benchmarks in particular ZIP codes in a way that can predict costs better for those running facilities and the individuals using them.

"Today, there's no real benchmark of that," he said. "We've gathered information over the years — and now we're putting it to use. We're mapping the trends of cost, how it's changing over the years and we can predict future costs in an area."

Then, there are the technologies introduced in other industries as well during the pandemic, such as the mask facial detection and the remote temperature scanning systems.

Companies like SmartLinx have made sure they're not a step behind on engineering any of these solutions for facilities that hold the populations most at-risk of bad COVID-19 outcomes.

"And all of these are solutions we can only enhance over time," he said. "We believe this advanced technology will be really beneficial as we work to help transform senior care facilities."

Brett Johnson
bjohnson@roi-nj.com
@reporterbrett



ADDITIONAL LINKS

FOLLOW US

Subscribe   Media Kit   Report News
Advertise   Contact ROI-NJ

Copyright © 2022 ROI-NJ. All rights reserved

Powered by Web Publisher PRO

X



# EXHIBIT G



## SAAS TERMS AND CONDITIONS AGREEMENT

This Agreement (**"Agreement"**) is entered into as of December 22nd, 2017 (the **"Effective Date"**), between **SmartLinx Solutions, LLC**, a Delaware limited liability company having offices at 333 Thornall Street, 4th Floor, Edison, NJ 08837 (**"SmartLinx"**) and Our Lady of Angels Retirement Community, An Illinois Not for Profit Corporation, having offices 1201 Wyoming Avenue, Joliet, Illinois 60435 (the **"Customer"**).




This Agreement sets forth the terms under which SmartLinx will provide Customer with access to and use of certain software-as-a-service offering(s) identified in the applicable Order Schedule (each a **"Subscription Service"** and collectively, the **"Subscription Services"**) and related Equipment. Any updates or enhancements to a Subscription Service provided as part of Maintenance for same will be deemed to be part of such Subscription Service. The Subscription Services are hosted by SmartLinx and accessed and used by Authorized Users via the Internet.

### 1. Definitions.

**"Administrator(s)"** means the Authorized User(s) designated by Customer who are responsible for administering the Subscription Service and who are issued an Administrator login by SmartLinx or Customer.

**"Affiliates"** means any entity that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with a party to this Agreement, by way of majority voting equity ownership.

**"Agreement"** means these terms and conditions, together with any and all Order Schedules referencing these terms and conditions, the Exhibits attached hereto and any other statements of work, exhibits or appendices thereto, whether attached or incorporated by reference.

**"Authorized Users"** means individuals who are authorized by Customer to use the Subscription Service, for whom subscriptions to a Subscription Service have been purchased on an Order Schedule, and who have been supplied user identifications and passwords by Customer.

**"Customer"** means the customer entity that has executed an Order Schedule with SmartLinx.

**"Customer Data"** means all electronic data or information submitted by Customer or its Authorized Users to and stored by the Subscription Service.

**"Documentation"** means the administrative and user manuals published by SmartLinx and provided by SmartLinx to Customer with the Subscription Service, which may be

updated from time to time, but excluding any sales or marketing materials.

**"Electronic Communications"** means any information transmitted in whole or part, electronically received and/or transmitted through the Subscription Service.

**"Equipment"** shall mean the hardware components (if any) described in an Order Schedule and supplied by SmartLinx hereunder.

**"Equipment Maintenance"** means and consist solely of the services described in the SmartLinx Equipment Maintenance Guide.

**"Equipment Maintenance Guide"** means the SmartLinx Equipment Maintenance Guide in effect at the start of then-current maintenance period. A copy of the current Equipment Maintenance Guide is attached hereto as **Exhibit C**, which is hereby incorporated by reference.

**"Facility"** means the Customer's facility location specified in any Order Schedule.

**"Initial Term"** means the initial subscription term specified in the applicable Order Schedule, excluding any renewals terms.

**"Order Schedule"** means an ordering document which references this Agreement and is executed by both parties which specifies the Subscription Service, implementation services, Equipment, and/or Equipment Maintenance to be ordered by Customer and provided by SmartLinx subject to the terms of this Agreement.

**"Term"** has the meaning set forth in Section 10.1 below.

**"Third Party Services"** means applications or services that are provided by third parties, and interoperate with the Subscription Service.

### 2. Subscription Service License Terms

**2.1 License.** Subject to the terms of this Agreement and payment of the applicable fees, SmartLinx grants to Customer a limited, non-exclusive, non-transferable license to permit Authorized Users to use the Subscription Service for the duration of the Term specified in the applicable Order Schedule, subject to the use parameters specified in such Order Schedule, and solely for the internal business operations of Customer and its Affiliates.

**2.3 Authorized Users: Passwords, Access, and Notification.** Customer, through its Administrator, shall authorize access to and assign unique passwords and user names up to the number of Authorized Users purchased by Customer on the Order Schedule. Authorized User logins are for designated Authorized Users and cannot be shared or used by more than one Authorized User. Customer will

be responsible for the confidentiality and use of Authorized User's passwords and user names. SmartLinx will act as though any Electronic Communications it receives under Customer's passwords, user name, and/or account number will have been sent by Customer. Customer shall use commercially reasonable efforts to prevent unauthorized access to or use of the Subscription Service and shall promptly notify SmartLinx of any unauthorized access or use of the Subscription Service and any loss or theft or unauthorized use of any Authorized User's password or name and/or Subscription Service account numbers.

**2.4 Use of the Subscription Service.** Customer is responsible for all activities and Electronic Communications conducted by its Authorized Users and for its Authorized Users' compliance with this Agreement, including the content of all Customer Data. Customer will not: (a) sell, lease, license or sublicense the Subscription Service; (b) introduce into or transmit through the Subscription Service any virus, worm, trap door, back door, and other harmful or malicious code, files, scripts, agents, or programs; (c) transmit or store infringing material in the Subscription Service; (d) send any Electronic Communication from the Subscription Service that is unlawful, harassing, libelous, defamatory or threatening. Except as permitted by this Agreement, no part of the Subscription Service may be copied, republished, displayed in any form or by any means. Customer agrees not to access the Subscription Service by any means other than through the interfaces that are provided by SmartLinx.

**2.5 Third Party Services.** SmartLinx or third party providers may offer Third Party Services to Customer hereunder. Customer acknowledges and understands that the use of such Third Party Services shall be subject to separate terms and conditions as set forth on an Order Schedule or as otherwise provided to Customer. Except as expressly set forth in the Order Schedule, SmartLinx does not warrant any such Third Party Services. If Customer installs or enables Third Party Services for use in conjunction with the Subscription Service, Customer agrees that SmartLinx may allow such third party providers to access Customer Data as required for the interoperation of such Third Party Services with the Subscription Service, and any exchange of data or other interaction between Customer and a third party provider is solely between Customer and such third party provider. Finally, the continuing availability of the Third Party Services is subject to the continued effectiveness and terms of the contract between SmartLinx and the third party provider.

**2.6 Security.** Each party will use commercially reasonable measures to maintain and enforce physical and logical security procedures to prevent unauthorized access to and/or use of the Subscription Service and the Customer Data. SmartLinx will use commercially reasonable measures to secure and defend the Subscription Service against "hackers" and others who may seek to modify or access the Subscription Service or the Customer Data

without authorization. SmartLinx will use commercially reasonable efforts to remedy any breach of security or unauthorized access. SmartLinx shall not be responsible or liable for the disclosure of or unauthorized access to Customer Data caused by Customer, its Authorized Users, Customer's affiliates, or the employees, agents or contractors of any of the foregoing.

**2.7 Transmission of Data.** The Subscription Service allows Customer to send and receive Electronic Communications and Customer understands that the technical processing and transmission of Customer's Electronic Communications is fundamentally necessary to use of the Subscription Service. Customer acknowledges and understands that Customer's Electronic Communications will involve transmission over the Internet, and over various networks, only part of which may be owned and/or operated by SmartLinx. SmartLinx is not responsible for any Electronic Communications and/or Customer Data which are delayed, lost, altered, intercepted or stored during the transmission of any data across networks not owned and/or operated by SmartLinx, including but not limited to, the Internet and Customer's local network.

**2.8 Service Level.** SmartLinx's commitment to the availability of the Subscription Service and related matters are specified on the "Service Level Agreement" attached hereto as Exhibit A (the **"Service Level Agreement"** or **"SLA"**), which is hereby incorporated by reference.

**2.9 Maintenance and Support for Subscription Service.** SmartLinx will provide Maintenance and Support for the Subscription Service as described on the "SAAS Maintenance Guide" attached on Exhibit B hereto (**"SAAS Maintenance and Support"**), which is hereby incorporated by reference. SAAS Maintenance and Support is included in the subscription fees paid by Customer for the Subscription Service. SmartLinx also offers training classes, implementation services, consultation and enhanced support services for additional fees.

**2.10 Implementation Services.** Implementation and training services ordered by Customer as set forth in the applicable Order Schedule will be performed in accordance with SmartLinx's customary practices for the level of services purchased. Implementation is performed remotely unless otherwise specified.

**2.11 Compliance with Laws.** SmartLinx will comply with all applicable laws and regulations affecting the operation of SmartLinx' business, including any applicable export restrictions and data protection laws. Customer will be solely responsible: (i) for compliance by Customer with all laws and governmental regulations affecting Customer's business, (ii) for using the Subscription Services in a manner to assist it in complying with same, and (iii) the content and accuracy of all reports and documents prepared in whole or in part by using the Subscription Services. Customer will review any calculations made by using the Subscription Services and satisfy itself that those calculations are

correct. The Subscription Services are not a substitute for the advice of an attorney and do not include any legal, regulatory, accounting or tax advice and Customer and its affiliates will rely solely upon their own advisors with respect to any such advice.  Customer agrees and acknowledges that SmartLinx is not a law firm, does not provide legal advice or representation, and that no attorney-client relationship exists or will be formed between SmartLinx and Customer.

**3. Equipment and Maintenance.**
**3.1  Equipment.** Equipment may be provided to Customer under a purchase transaction or an equipment lease transaction as specified in the applicable Order Schedule. In either case, SmartLinx shall deliver and Customer shall accept delivery of the Equipment at the location set forth in the Order Schedule.
**3.2  Equipment Maintenance.** SmartLinx will provide Equipment Maintenance to Customer for the period(s) set forth in the Order Schedule, subject to Customer's payment of the applicable maintenance or leasing fees to SmartLinx as specified in such Order Schedule.

**4.  Confidentiality**
**4.1  Confidential Information.** For purposes of this Agreement, **"Confidential Information"** shall include the terms of this Agreement, Customer Data, each party's proprietary technology, business processes and technical product information, designs, issues, all communication between the Parties regarding the Subscription Service and any information that is clearly identified in writing at the time of disclosure as confidential. Notwithstanding the foregoing, Confidential Information shall not include information which: (1) is known publicly; (2) is generally known in the industry before disclosure; (3) has become known publicly, without fault of the Receiving Party; (4) the Receiving Party becomes aware of from a third party not bound by non-disclosure obligations to the Disclosing Party and with the lawful right to disclose such information to the Receiving Party; (5) is independently developed by the Receiving Party without use of or reference to the Confidential Information, or (6) is aggregated, de-identified data that does not contain any personally identifiable or Customer-specific information.
**4.2 Non-Disclosure Obligations.** Each party agrees: (a) not to use or disclose Confidential Information except to the extent reasonably necessary to perform its obligations or exercise rights under this Agreement or as directed by the disclosing party; (b) to protect the confidentiality of Confidential Information in the same manner as it protects the confidentiality of similar information and data of its own (at all times exercising at least a reasonable degree of care in the protection of such Confidential Information), and (c) to make Confidential Information available to authorized persons only on a "need to know" basis. Either party may disclose Confidential Information on a need to

know basis to its contractors and service providers who have executed written agreements requiring them to maintain such information in strict confidence and use it only to facilitate the performance of their services in connection with the performance of this Agreement. Notwithstanding the foregoing, this Section will not prohibit the disclosure of Confidential Information to the extent that such disclosure is required by law or order of a court or other governmental authority or a regulation.

**5. Ownership**
**5.1 Ownership of Subscription Services.** Customer agrees that all rights, title and interest in and to all intellectual property rights in the Subscription Services and Documentation (including without limitation the software used to provide the Subscription Services) are retained and owned exclusively by SmartLinx or its licensors. In addition, SmartLinx shall have a royalty-free, worldwide, transferable, sub-licensable, irrevocable, and perpetual license to use or incorporate into the Subscription Services and its other product and service offerings any suggestions, enhancement requests, recommendations or other feedback provided by Customer, including Authorized Users, relating to the operation of the Subscription Services and associated services. Any rights not expressly granted herein are reserved by SmartLinx. SmartLinx service marks and trademarks, logos and product and service names are marks of SmartLinx (the **"SmartLinx Marks"**). Customer agrees not to display or use the SmartLinx Marks in any manner without SmartLinx's express prior written permission. The trademarks, logos and service marks of Third Party Application providers (**"Marks"**) are the property of such third parties. Customer is not permitted to use these Marks without the prior written consent of such third party who may own the Mark.
**5.2  Ownership of Project Deliverables.**
(a)  Subject to subsection (b) below, Customer will own all intellectual property rights in and to: (i) its proprietary customer materials; and (ii) all original components of the project deliverables created by SmartLinx and delivered to Customer pursuant to implementation and other consulting services provided under this Agreement ("Project Deliverables") upon payment of all fees due for such services.
(b)   Notwithstanding the foregoing, SmartLinx and its licensors will retain exclusive ownership of all intellectual property rights in and to the following (collectively "SmartLinx Materials"): (i) all pre-existing works, inventions, technology, data and materials incorporated or used in association with the design and development of the Project Deliverable; (ii) any works created by SmartLinx pursuant to its performance of such services, including, but not limited to, any proposed, draft, or preparatory materials, that are not incorporated into the Project Deliverables; (iii) all derivatives, improvements, enhancements or extensions of the SmartLinx Materials,

and (iv) all ideas, concepts, know-how, code and techniques, that SmartLinx may use, conceive of or first reduce to practice in connection with such services that are not uniquely applicable to Customer or that have general applicability in the art. Upon payment of all fees due for the Subscription Services, SmartLinx will grant to Customer a non-exclusive, non-transferable, indefinite, worldwide, royalty-free and paid-up license to use the SmartLinx Materials as incorporated in the Project Deliverable for Customer's internal business purposes, provided that Customer will have no right to use such SmartLinx Materials apart from the Project Deliverable or in any other manner, and Customer's ownership under (ii) above shall be subject to such license of the SmartLinx Materials. For purposes of this Agreement, neither the term "Project Deliverable" nor the term "SmartLinx Materials" shall under any circumstances be deemed to include any commercial software products of SmartLinx and/or any subscription to use same as a hosted service (SAAS).

## 6. Payment Terms

**6.1 Fees.** SmartLinx will invoice Customer for all amounts payable to SmartLinx hereunder in accordance with the applicable Order Schedule ("**Fees**"). Customer will pay all Fees within thirty (30) days of the invoice date. All amounts are payable in U.S. dollars. Payment amounts which are more than 30 days late after written notice of delinquency has been provided will incur interest in an amount equal to one and one-half percent (1 1/2%) per month or the maximum allowed by law, whichever is less.

**6.2 Taxes.** All Fees payable under the applicable Order Schedule are net amounts and do not include taxes or duties of any kind. Customer will be responsible for and will promptly pay, any applicable duties, sales tax, use tax and value added taxes (VAT) or other similar taxes, if any, associated with this Agreement or Customer's receipt or use of the Subscription Service, excluding taxes based on SmartLinx's gross or net income or franchise taxes. In the event that SmartLinx is required to collect or pay any tax for which Customer is responsible, Customer will pay such tax directly to SmartLinx. If Customer is a tax-exempt organization and is not obligated to pay taxes arising out of this Agreement, Customer will provide SmartLinx with any required documentation to verify its tax-exempt status with the applicable taxing authorities.

## 7. Warranties

**7.1 Warranty of Subscription Service Functionality.** SmartLinx warrants that (i) each Subscription Service will achieve in all material respects the functionality described in the Documentation applicable to such Subscription Service purchased by Customer, and (ii) such functionality of the Subscription Service will not be materially decreased during the Term. Customer's sole and exclusive remedy for SmartLinx's breach of this warranty shall be that SmartLinx shall be required to use commercially reasonable efforts to

modify the Subscription Service to achieve in all material respects the functionality described in the Documentation and if SmartLinx is unable to restore such functionality, Customer shall be entitled to terminate the applicable subscription to use the Subscription Services (as described in the corresponding Order Schedule) and receive a prorated refund of any prepaid subscription fees paid under such Order Schedule for its use of the Subscription Service for the remaining terminated portion of the Term. SmartLinx shall have no obligation with respect to a Subscription Service warranty claim unless notified of such claim within sixty (60) days of the first instance of any material functionality problem, and such notice must be sent to SmartLinx Customer Support. The warranties set forth in this Section are made to and for the benefit of Customer only. Such warranties shall only apply if the applicable Subscription Service has been utilized in accordance with this Agreement and applicable law.

**7.2 No Virus Warranty.** SmartLinx use an updated version of a commercially available anti-virus application to scan the Subscription Services to discover and remove viruses, Trojan horses, worms, spyware, or other such malicious code ("**Malicious Code**").

**7.3 Implementation Services Warranty.** SmartLinx warrants that it will perform the implementation services ordered hereunder in a professional and workmanlike manner.

**7.4 Equipment Warranty.** All Supported Equipment supplied by SmartLinx hereunder is covered by and subject to the warranty, repair and replacement provisions set forth in the Equipment Maintenance Guide to maintain normal operation of the Equipment. "**Supported Equipment**" means any Equipment acquired hereunder for which Customer is entitled to Equipment Maintenance from SmartLinx by paying the appropriate annual Equipment Maintenance fees or Equipment leasing fees, as specified in the applicable Order Schedule.

**7.5 Disclaimer.** *EXCEPT AS STATED IN SECTIONS 2 AND 7 OF THIS AGREEMENT, SMARTLINX DOES NOT REPRESENT THAT CUSTOMER'S USE OF THE SUBSCRIPTION SERVICE WILL BE UNINTERRUPTED OR ERROR-FREE OR THAT THE SUBSCRIPTION SERVICE WILL MEET ALL OF CUSTOMER'S REQUIREMENTS. THE WARRANTIES STATED IN THIS SECTION 2 AND 7 ABOVE ARE THE SOLE AND EXCLUSIVE WARRANTIES OFFERED BY SMARTLINX. THERE ARE NO OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.*

## 8. Limitations of Liability.

**8.1** *IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER OR ANY THIRD PARTY FOR LOST PROFITS OR REVENUE OR FOR INCIDENTAL, CONSEQUENTIAL, PUNITIVE, COST OF COVER, SPECIAL, RELIANCE OR EXEMPLARY DAMAGES, OR INDIRECT DAMAGES OF ANY*

rev 1-2016

*TYPE OR KIND HOWEVER CAUSED, WHETHER FROM BREACH OF WARRANTY, BREACH OR REPUDIATION OF CONTRACT, NEGLIGENCE, OR ANY OTHER LEGAL CAUSE OF ACTION FROM OR IN CONNECTION WITH THIS AGREEMENT (AND WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES TO THE MAXIMUM EXTENT PERMITTED BY LAW).*

**8.2** *EXCEPT WITH REGARD TO AMOUNTS PAYABLE BY CUSTOMER UNDER THIS AGREEMENT THE MAXIMUM LIABILITY OF EITHER PARTY TO THE OTHER OR ANY THIRD PARTY WHATSOEVER ARISING OUT OF OR IN THE CONNECTION WITH THIS AGREEMENT SHALL IN NO CASE EXCEED THE THEN-CURRENT EQUIVALENT OF 12 MONTHS IN SUBSCRIPTION FEES FOR THE SUBSCRIPTION SERVICES PAID/PAYABLE UNDER THIS AGREEMENT.*

**9. Indemnification**
**9.1 SmartLinx's Indemnity.**  SmartLinx shall, at its own expense, defend Customer from and against any and all allegations, threats, claims, suits, and proceedings brought by third parties (collectively **"Claims"**) alleging that the Subscription Service, as used in accordance with the terms and conditions of this Agreement, infringes the copyrights, trade secrets, patents or trademarks of such third party and shall hold Customer harmless from and against liability, damages, and costs finally awarded or entered into in settlement (including, without limitation, reasonable attorneys' fees) (collectively, **"Losses"**) to the extent based upon such a Claim. Excluded from these indemnification obligations are Claims to the extent arising from: (a) use of the Subscription Service in violation of this Agreement or applicable law, (b) use of the Subscription Service after SmartLinx notifies Customer to discontinue use because of an infringement claim, (c) modifications to the Subscription Service not made by SmartLinx, or (d) use of the Subscription Service in combination with any software, application or service not provided by SmartLinx. If a Claim is brought or threatened, SmartLinx shall, at its sole option and expense, use commercially reasonable efforts either: (a) to procure for Customer the right to continue using the Subscription Service without cost to Customer; (b) to modify or replace all or portions of the Subscription Service as needed to avoid infringement, such update or replacement having substantially similar or better capabilities; or (c) if the remedies described in (a) and (b) above are not commercially feasible, terminate the Agreement and provide to the Customer any pro-rata refund of the Subscription Service subscription fees pre-paid under the Agreement for the remaining terminated portion of the Term. The rights and remedies granted to Customer under this Section 9.1 state SmartLinx's entire liability, and Customer's exclusive remedy, with respect to any claim of infringement of the intellectual property rights of any third party.
**9.2 Customer's Indemnity.** Customer shall, at its own expense, defend SmartLinx from and against any and all

Claims alleging that the Customer Data or any Customer trademarks or service marks, or any use thereof, infringes the intellectual property rights or other rights, or has caused harm to a third party and shall hold SmartLinx harmless from and against liability for any Losses to the extent based upon such Claims.
**9.3 Indemnification Procedures and Survival.** In the event of a potential indemnity obligation under this Section 9, the Indemnified party shall: (i) promptly notify the indemnifying party in writing of such Claim; (ii) allow the indemnifying party to have sole control of its defense and settlement; and (iii) upon request of the indemnifying party, cooperate in all reasonable respects, at the indemnifying party's expense, with the indemnifying party in the investigation and defense of such Claim. The indemnification obligations under this Section 9 are expressly conditioned upon the indemnified party's compliance with this Section 9.3.

**10. Term; Subscription Renewals; Termination**
**10.1 Term; Renewals.** The term of this Agreement shall be for an initial period of three (3) years from the Effective Date and shall continue thereafter for so long as there is at least one outstanding Order Schedule hereunder whose term (including any renewals thereof) has not expired (**"Term"**). The Term of each Subscription Services subscription purchased under an Order Schedule shall continue for the initial term referenced in such Order Schedule and shall automatically renew for successive twelve (12) month periods unless either party gives the other written notice of non-renewal at least ninety (90) days prior to the expiration of the then-current term (or unless otherwise provided in the applicable Order Schedule). SmartLinx reserves the right to modify pricing applicable to any Subscription Services renewal term provided that it gives Customer at least one-hundred twenty (120) days advance written notice of such change.
**10.2 Termination, Expiration.**
a.   Either party may terminate this Agreement for material breach thereof by the other party upon thirty (30) days prior written notice of such breach which is not cured during such notice period.  Termination of this Agreement for material breach, as set forth herein, shall terminate all Order Schedules hereunder. Either party may terminate any Order Schedule for material breach of such Order Schedule by the other party upon thirty (30) days prior written notice of such breach which is not cured during such notice period. Termination of any Order Schedule for material breach thereof shall not terminate this Agreement or any other Order Schedule.
b.   Such notice by the complaining party shall expressly state all of the reasons for the claimed material breach in sufficient detail so as to provide the alleged breaching party a meaningful opportunity to cure such alleged breach and shall be sent to the Legal Department of the alleged breaching party at the address listed in the heading of this

Agreement (or such other address that may be provided pursuant to this Agreement) ("**Notice**").

c. Either party may terminate this Agreement immediately upon written Notice if the other party (i) files a petition, or has a petition filed against it, under any laws relating to liquidation or distribution of assets for the benefit of its creditors due to insolvency which is not abandoned or dismissed within thirty (30) days; or (ii) ceases to carry on business operations in the ordinary course.

d. Upon termination or expiration of this Agreement for any reason, Customer shall have no rights to continue use of the Subscription Service. If this Agreement is or any Order Schedule is terminated as a result of Customer's material breach of the Agreement, then SmartLinx shall be entitled to all of the Fees due under this Agreement and any terminated Order Schedules (applicable) for the entire committed subscription term under such Order Schedules. If this Agreement is terminated as a result of SmartLinx's material breach of this Agreement, then Customer shall be entitled to a refund of the pro rata portion of any prepaid subscription fees paid by Customer to SmartLinx under this Agreement for the remaining terminated portion of the Term.

**10.3 Suspension for Delinquent Account.** SmartLinx reserves the right to suspend Customer's and any of its Authorized Users' access to and/or use of the Subscription Service for any accounts for which any payment is due but unpaid but only after SmartLinx has provided Customer at least two (2) delinquency notices, and at least forty-five (45) days have passed since the transmission of the first notice. Customer agrees that SmartLinx shall not be liable to Customer or to any Customer Affiliate or other third party for any suspension of the Subscription Service pursuant to this Section.

**10.4 Survival.** Sections 4, 5, 8, 10, 11 and 12 and any other provisions necessary to interpret the respective rights and obligations of the parties hereunder will survive any termination or expiration of this Agreement, regardless of the cause of such termination or expiration.

**11.** **Non-Solicitation.** Customer agrees that during the Term and for a period of twelve (12) months thereafter, neither Customer nor any of its Affiliates shall solicit any employee or subcontractor of SmartLinx to leave his/her/its employment or engagement with SmartLinx, or hire or engage as an employee, consultant, independent contractor or in any other capacity, any employee or subcontractor of SmartLinx, without the prior written consent of SmartLinx. In the event that Customer violates the foregoing, it shall pay liquidated damages to SmartLinx in an amount equal to the first year's compensation to such individual following such hire or engagement in violation of this provision. General recruitment activities which are in no way targeted at the employees or former employees of

SmartLinx shall not be deemed a prohibited solicitation under this Section.

**12. General Provisions.**

**12.1 Notices.** Notices between the parties will be by personal delivery, currier, facsimile transmission, or certified or registered mail, return receipt requested, and will be deemed given upon receipt at the address of the recipient party or ten (10) days after deposit in the mail. Addresses used will be the ones set forth above or such other address as a party hereto will notify the other in writing.

**12.2 Severability.** In the event of any invalidity of any provision of this Agreement, the parties agree that such invalidity will not affect the validity of the remaining portions of this Agreement, and further agree to substitute for the invalid provision a mutually agreeable valid provision that most closely approximates the intent of the invalid provision.

**12.3 Headings.** The headings in this Agreement are for convenience of reference only and have no legal effect.

**12.4 No Third Party Beneficiaries.** This Agreement is intended for the sole and exclusive benefit of the signatories and is not intended to benefit any third party. Only the parties to this Agreement may enforce it.

**12.5 Assignment.** Neither party may assign this Agreement or any of their respective rights or obligations hereunder, without the other party's prior written consent; provided, that such consent will not be unreasonably withheld or delayed and shall not be required for assignment to an Affiliate of the assigning party or the purchaser of all or substantially all of the assets or equity securities of, the assigning party. Any assignment in violation of this Agreement will be void and of no force and effect. All the terms and provisions of this Agreement will be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

**12.6 Relationship.** Each party hereto is an independent contractor, and neither party is, nor will claim to be, a legal representative, partner, franchisee, agent or employee of the other.

**12.7 Publicity.** Except as permitted by Customer in the applicable Order Schedule, SmartLinx will not make other use of Customer's name, logo or trademarks or issue any public announcements or press releases regarding this Agreement without Customer's prior written consent.

**12.8 Force Majeure.** Neither party will be liable to the other for a failure or delay in its performance of any of its obligations under this Agreement (except for the payment of amounts due hereunder) to the extent that such failure or delay is caused by circumstances beyond its reasonable control or by events such as fire, riot, flood, labor disputes, natural disaster, regulatory action, internet or telecommunications failures, terrorist acts, or other causes beyond such party's reasonable control, provided that the non-performing party gives notice of such condition and

continues or resumes its performance of such affected obligation to the maximum extent and as soon as reasonably possible.

**12.9 Counterparts and Electronic Signatures.** This Agreement may be executed in counterparts. A signature transmitted via facsimile, scanned original or third party e-signature system will be deemed an enforceable signature for the purpose of demonstrating the signing party's assent to the Agreement.

**12.10 Entire Agreement.** This Agreement (including the Exhibits hereto) constitutes the entire understanding and agreement between the parties with respect to the subject matter addressed herein and supersedes any and all prior or contemporaneous oral or written communications with

respect to such subject matter. In the event of a conflict between the foregoing terms and conditions and any Exhibits to this Agreement, the foregoing terms and conditions will control. The parties agree that in the event Customer utilizes a purchase order, any term therein which purports to modify or supplement the terms of this Agreement will be void with no force or effect.

**12.11 Governing Law.** This Agreement will be governed by the laws of the State of New Jersey, excluding its rules regarding conflicts of law. Venue for any dispute hereunder will be a court of competent jurisdiction located in Middlesex County, New Jersey, and the parties irrevocably submit to the exclusive jurisdiction of such courts.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date below:

Customer: Our Lady of Angels Retirement Community, An Illinois Not for Profit Corporation

Print Name    _George Block_

Title    _Administrator_

Date    _12/22/2017_

Signature    _George Block_

**SmartLinx Solutions, LLC**

Print Name    _____

Title    _____

Date    _____

Signature    _____

rev 1-2016

**Exhibit A**

**Service Level Agreement
for Subscription Services**

This Service Level Agreement ("**SLA**") is an Exhibit to the SmartLinx SaaS Terms and Conditions Agreement between SmartLinx Solutions LLC and Customer (the "**Agreement**"). Capitalized terms not otherwise defined on this Exhibit will have the meanings given to them in the Agreement. This SLA applies to the Subscription Service during the Term as set forth in the applicable Order Schedule.

**1. Availability.**

a.  <u>Formula</u>. The Subscription Service will, subject to the exceptions listed below, be available 99% of the time during each calendar quarter from the time that the Subscription Service is being used in Customer's production environment following completion of implementation services (referred to herein as the "**Availability Commitment**"). The availability of the Subscription Service for a given quarter will be calculated according to the following formula (referred to herein as the "**Availability**"):

Where:                 Total minutes in the quarter = TQM
                            Total minutes in the quarter the Subscription Service is unavailable = TQU

And:             **((TQM-TQU) X 100)/TQM**

b. For purposes of this calculation, the Subscription Service will be deemed to be unavailable (referred to herein as "**Unavailable**") only (i) if the Subscription Service does not respond to HTTP requests issued by SmartLinx's monitoring software or (ii) for the duration of a Severity-1 Critical Error as defined in the SAAS Maintenance Guide, attached as an Exhibit to the Agreement. Further, the Subscription Service will not be deemed Unavailable for any downtime or outages that result from the exceptions set forth in Section 2 of this SLA. Customer acknowledges that SmartLinx's system logs, records and data will provide the basis for SLA calculations and determinations.

**2. Exceptions**

a. The Subscription Service will not be considered to be Unavailable (and minutes will not accrue as TMU) for any downtime or outages that result from any maintenance performed by SmartLinx: (i) during the standard SmartLinx implementation window(s) agreed upon by SmartLinx and Customer during Customer's implementation period; (ii) during SmartLinx's standard maintenance windows as SmartLinx may reasonably designate from time to time (collectively referred to herein as "**Scheduled Maintenance**"); or (iii) during a maintenance period performed at Customer's request outside of the normally scheduled maintenance window.

b. The SmartLinx network extends to, includes and terminates at the data center located router that provides the outside interface of each of SmartLinx's WAN connections to its internet backbone network providers (referred to herein as the "**SmartLinx Network**"). The Subscription Service will not be considered Unavailable (and minutes will not accrue as TMU) for any downtime or outages that result from: (i) Customer's information content or application programming, acts or omissions of Customer or its agents; (ii) Customer's use of hardware, network services or components thereof which are controlled by Customer or third parties (other than SmartLinx contractors or agents) which impair Customer's connections to the Subscription Services or the operation or performance of the Subscription Services and/or the transmission of data, (iii) delays or failures due to circumstances beyond SmartLinx's reasonable control that could not be avoided by its exercise of due care (including Force Majeure events as set forth in the Agreement); or (iv) failures of the internet backbone itself and the network by which Customer connects to the Internet backbone or any other network unavailability outside of the SmartLinx Network.

**3. Remedies.** Subject to the exceptions provided for in this SLA, Customer will have the rights set forth below.

a.  If SmartLinx fails to meet the 99% Availability Commitment for two consecutive calendar quarters, then Customer will be entitled, as its sole remedy, to a credit equal to 10% of the pro-rated, quarterly portion of the annual

NOT AN OFFICIAL COPY

Subscription Services Fee (i.e., the annual Subscription Services Fee ÷ 4) (a "**Service Credit**") which shall be applied as an offset to then upcoming invoices for annual fees due for the affected Subscription Service. Claims under this provision must be made in good faith and by submitting a written request to SmartLinx within sixty (60) days after the end of the relevant month.

b.  The maximum amount of Service Credits for any calendar quarter shall not exceed 10% of the pro-rated, quarterly portion of the annual Subscription Services Fee for that calendar quarter. The maximum amount of all Service Credits each year to Customer shall not exceed 10% of the annual Subscription Services Fees for that year.

c.  Remedies will not accrue (i.e., no Service Credits will be issued and an outage will not be considered Unavailable for purposes of this SLA) if Customer is not current in its payment obligations.

d.  Upon written request from Customer, SmartLinx will promptly provide a report specifying the level of Unavailability and Service Credits due (if any) for the requested quarter. To receive Service Credits, Customer must submit such request within ninety (90) days after the end of the quarter to which the request pertains.



NOT AN OFFICIAL COPY

2

**Exhibit B**

**SAAS Maintenance Guide**
**for Subscription Services**

This SAAS Maintenance Guide is an Exhibit to the SmartLinx SaaS Terms and Conditions Agreement between SmartLinx Solutions, LLC and Customer (the "**Agreement**"). Capitalized terms not otherwise defined on this Exhibit will have the meanings given to them in the Agreement. This Exhibit sets forth the terms, conditions, and procedures under which maintenance and support ("**SAAS Support**") is offered for the Subscription Service during the Term as set forth in the applicable Order Schedule.

1.  <u>Definitions.</u> Except as otherwise defined in this Exhibit, all capitalized terms shall have the meaning set forth in the Agreement.

    "Business Hours" or "Business Days" means Monday – Friday 8AM – 8PM (EST), excluding SmartLinx holidays.
    "<u>Release</u>" shall mean any release, update, new version, service release or patch to the Subscription Services, which SmartLinx makes generally available without additional charge to customers of the applicable Subscription Services. "Releases" do not include new versions or new features or modules which SmartLinx makes generally available as separate or add-on products.

2.  <u>Scope</u>: SaaS Support will consist of:
    a.  Help Desk support (email, telephone and website) for problem resolution during Business Hours;
    b.  24x7 telephone support for Severity-1 CRITICAL issues (as defined in the table below); and
    c.  Releases made generally available during the Subscription Services License Term.

3.  <u>Response Times.</u> Response times will be as follows. A "Response" is SmartLinx's initial confirmation via phone, job ticket, email or otherwise of receipt of Customer's support request. Except for Severity-1 CRITICAL issues, calls or emails received by SmartLinx after Business Hours shall be deemed received at the start of the next Business Day.

| Priority | Definition | Response Time |
|---|---|---|
| SEVERITY-1 CRITICAL | The Subscription Service suffers an error or issue in a production down situation that cannot be reasonably circumvented and which so substantially impairs the performance of the Subscription Service, as to effectively render the Subscription Service unusable. | 4 Hours |
| SEVERITY-2 HIGH | The Subscription Service suffers an error or issue, which cannot be reasonably circumvented, and which substantially impairs the use of one or more portions or features of the Subscription Service required by Customer to perform necessary business functions but does not effectively render the Subscription Service unusable as a whole. | 2 Business Days |
| MODERATE | The Subscription Service suffers an error or issue that has: (a) limited impact to production environment (b) minor | 3 Business Days |

1



| | | disruption to business, or (c) easily implemented workarounds. | |
| --- | --- | --- | --- |
| | MINOR | A general inquiry, information request, enhancement request, or document request. | 5 Business Days |

4.  <u>Out of Scope.</u> The following are out of scope of Support Services: (i) any hardware supplied by SmartLinx or software embedded in or installed on such hardware; (ii) set-up, installation, or configuration of hardware and software required for the Customer to access the Subscription Service; (iii) any software or interfaces not provided by SmartLinx; (iv) consultation, training or research with respect to Customer-created documents and information; and (v) Professional Services or support of or corrections to Professional Services work product and other customizations which may be provided by SmartLinx.

5.  <u>Supported Versions.</u> Support Services are available only for the current Version and the prior two Releases of the applicable Subscription Services.

6.  <u>Support Center.</u> Support Center contact information is as set forth below (and subject to change on prior written notice):

    Telephone: 800-307-8535
    Email: support@smartlinxsolutions.com
    Web: http://support.smartlinxsolutions.com

7.  <u>Customer Support Representatives.</u> All support inquiries and communications from or to Customer shall be conducted through Customer's support representatives who (i) have completed the applicable SmartLinx standard training curriculum at Customer's expense; (ii) have been identified as support representatives in writing to SmartLinx; and (iii) have, as reasonably determined by SmartLinx, an appropriate level of technical skills and experience generally, and in the use and administration of the applicable Subscription Services. Customer shall have three (3) months from the beginning of the initial Subscription License Term to ensure that its support representatives complete the training requirement specified in (i) above; thereafter any Customer support representatives who have not met this requirement will be removed from the support contact list and will no longer be entitled to receive helpdesk support.

8.  <u>Response.</u> The Severity Level of the problems reported by Customer will be reasonably determined by SmartLinx. SmartLinx will resolve each reported error or issue with the Subscription Service by using commercially reasonable efforts to provide: (i) a patch or fix as necessary; or (ii) a reasonable workaround for the error or issue; or, if either (i) or (ii) are not reasonably practicable, a specific action plan regarding how SmartLinx intends to address the reported error or issue and an estimate on how long it may take to correct or workaround the error or issue. If a permanent repair cannot be made, a temporary resolution (bypass and recovery) will be implemented to the extent possible. Customer agrees to use commercially reasonable efforts to assist and provide information to SmartLinx as required to replicate and resolve errors or issues with the Subscription Service reported by Customer.

9.  <u>SmartLinx Issues.</u> SAAS Support covers any issue or problem that is the result of a verifiable, replicable error in the Subscription Service. SmartLinx will use commercially reasonable efforts to verify and replicate the issue or problem reported by Customer. If SAAS Tech Support reasonably determines that Customer's issue or problem is not caused by SmartLinx or its systems, equipment, or software, nor constitutes a material failure by the Subscription Service to function in accordance with the Documentation included in the Subscription Service, SmartLinx is not obligated to provide support under this Agreement. Nevertheless, SmartLinx will, if possible, offer suggestions as to how Customer can remedy the problem and SmartLinx may offer to provide out of scope Professional Services at its then-current rates pursuant to a separate written agreement between the parties.

10. <u>Customer's Responsibilities.</u> Customer agrees to use commercially reasonable efforts to assist and provide information to SmartLinx as required to replicate and resolve errors or issues with the Subscription Service reported by Customer.

NON OFFICIAL COPY

Customer's Representative will initiate all requests for SAAS Support. The Representative must be trained, qualified and authorized to communicate all necessary information, perform diagnostic testing under the direction of the SmartLinx service representative as required to enable SmartLinx replicate software errors and be available during the performance of any SAAS Support if required.

11.  Submitting A Request / Getting An Answer.  At the time of Customer's initial call or e-mail, please be prepared to provide the information described in SmartLinx Support center support.smartlinxsolutions.com (Desk.com)

**Exhibit C**

**Equipment Maintenance Guide**

This Equipment Maintenance Guide is an Exhibit to the SmartLinx SaaS Terms and Conditions Agreement between SmartLinx Solutions, LLC and Customer (the **"Agreement"**), which is hereby incorporated by reference. This Equipment Maintenance Guide sets forth the terms, conditions, and procedures under which maintenance and support (**"Equipment Maintenance"**) is offered for certain Equipment supplied by SmartLinx to Customer (collectively, the **"Equipment"**). Equipment Maintenance for specified Equipment may be purchased under the applicable Order Schedule as part of a leasing transaction with SmartLinx for such Equipment or purchased separately for Equipment owned by Customer. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

**1. GENERAL**

a. <u>Scope</u>. Subject to Section 4 below (Exclusions), Equipment Maintenance will consist of the following warranty, repair and replacement services: (i) reasonable telephone support to assist with physical setup and configuration of the Equipment; (ii) patches and updates to software and firmware embedded in the Equipment that are provided by SmartLinx to its general customer base of Equipment Maintenance subscribers at no additional charge, (iii) reasonable telephone support to diagnose any Equipment failure to determine if such failure results from a manufacturing defect; (iv) repair of any such manufacturing defect by accessing such Equipment on line from a remote location; and (v) solely within the six (6) year period after Customer's purchase date or lease commencement date (as applicable) with regard to the covered Equipment (the **"Replacement Coverage Period"**), replacement of the defective Equipment with like or comparable Equipment if SmartLinx determines (in its sole discretion) that such manufacturing defect cannot be reasonably and economically repaired.

Equipment Maintenance will <u>not</u> include: (i) on-site services at Customer facilities; (ii) Equipment upgrades of any kind, or (iii) any other separately-priced services (such as on-site or customization services) or optional feature/functionality upgrades to software embedded in the Equipment which SmartLinx does not generally provide as part of Equipment Maintenance.

b. <u>Representative</u>. The representative(s) designated by Customer in the applicable Order Schedule will be SmartLinx's contact for communicating concerning Equipment Maintenance as described herein (**"Representative"**). Customer may change the Representative(s) upon written notice to SmartLinx at the following email address: maintenance@smartlinx.com.

c. <u>Term of Equipment Maintenance Offering</u>. For Equipment that is leased by Customer from SmartLinx, Equipment Maintenance is included in the Equipment lease fees as specified in the applicable Order Schedule. For Equipment that is purchased by Customer from SmartLinx, unless otherwise specified in the applicable Order Schedule, Equipment Maintenance is purchased separately for each piece of such Equipment for the term set forth on the applicable Order Schedule and the term shall automatically renew, subject to the eligibility limitations set forth in Section 4 below, for subsequent 12 month renewal terms unless either party provides written notice of its intention not to renew within the 90 period prior to the applicable renewal date. The number of renewal terms available from SmartLinx for various types of Equipment will vary based on the repair/replacement plans available from SmartLinx or the applicable third party Equipment manufacturer. SmartLinx may modify the Equipment Maintenance terms, including prices, applicable to renewal term of any Equipment Maintenance upon at least ninety (90) days written notice to Customer prior to the expiration of the then-current term.

1

## 2. EQUIPMENT SUPPORT

<u>Equipment Tech Support</u>. Customer will have access to SmartLinx's technical support personnel (**"Equipment Tech Support"**) during normal business hours.  Public holidays are recognized and considered to be non-business days.  For the purposes of this Agreement, normal business hours shall be defined as 8:00 am to 8:00 pm EST, Monday through Friday (excluding holidays).  Communications with Equipment Tech Support may be via telephone or e-mail.  SmartLinx provides a single entry point of contact that routes requests/problems to the appropriate Equipment Tech Support.

<u>Technical Support Contact Points</u>. The SmartLinx Customer Support personnel have the experience and training that allow us to provide optimal service to our customers.  Please see below for the contact information and standard business hours of operation for Customer Support.

Telephone: 800-307-8535
Email: support@smartlinxsolutions.com
Web: http://support.smartlinxsolutions.com

## 3. SUPPORT PROCEDURES

SmartLinx will utilize remote diagnostic procedures to isolate manufacturing defects in the Equipment.  If SmartLinx diagnoses an Equipment failure due to a defect which cannot be repaired using remote diagnostic procedures and the Replacement Coverage Period has not expired with regard to such Equipment, Customer shall obtain a Return Material Authorization ("RMA") number from SmartLinx and ship such defective Equipment, at no cost to SmartLinx, FOB Destination, freight and insurance prepaid.  Customer is responsible for properly insuring, packing and labelling, and for printing the applicable RMA number on each shipping label and packing slip.  Upon receipt of such Equipment, SmartLinx will repair or replace such defective Equipment and return same to the Customer at Customer's expense.

## 4.  EXCLUSIONS AND ELIGIBILITY.

An item of Equipment becomes ineligible for Equipment Maintenance and SmartLinx may withhold or refuse to provide all or any portion of the warranty, repair and/or replacement services comprising Equipment Maintenance with regard to such Equipment in the event of:

(i)     expiration of the Replacement Coverage Period with regard to such Equipment, after which such Equipment will be considered "vintage;"
(ii)    such Equipment  ceases to be manufactured by SmartLinx;
(iii)   damage, defects or malfunctions resulting from misuse, accident, neglect, tampering (including modification or replacement of any SmartLinx components by any party other than SmartLinx), unusual physical or electrical stress or causes other than normal and intended use (including force majeure);
(iv)   failure of Customer to provide and maintain a suitable installation environment for such Equipment (e.g., improper power distribution or insufficient air conditioning, overburdened network, improperly configured telecommunications system or routers, etc.);
(v)    Changes  to  Customer's  telecommunications  system,  databases,  LAN/WAN,  applications,  or  other environmental factors after the Equipment  is initially cut-over for production use;
(vi)   malfunctions resulting from the use of badges not approved by SmartLinx; and/or
(vii)  Customer's use of or compatibility problems from software or equipment not purchased from SmartLinx.

## 5. RE-CERTIFICATION

If the Equipment is relocated or is damaged due to an event described in Section 4 above, or if Maintenance coverage lapses for more than thirty (30) days, SmartLinx will require the Equipment to be certified as eligible for continued Maintenance.  Based on SmartLinx's inspection of the Equipment, certification may be contingent upon repair or replacement of specific Equipment components.  The waiver of any requirement specified in this Section must be in writing from an officer of SmartLinx.  All SmartLinx services related to certification are on a time-and-material basis; and Customer shall reimburse SmartLinx for all related direct out-of-pocket travel and living expenses.

NON-OFFICIAL COPY

6. **CUSTOMER'S RESPONSIBILITIES.** Customer agrees to cooperate with and provide to SmartLinx:

a. Remote access to the Equipment;

b. Use of required equipment, attachments, features, or communications facilities to facilitate service; and

d. Reasonable assistance to perform remote diagnostics. Customer also shall perform routine operator maintenance according to procedures in the applicable Equipment documentation.

NOT AN OFFICIAL COPY

3